[No. 15689.  Department Two.  July 9, 1920.]

CELIA LASMAN *et al.*, *Appellants*, v. CALHOUN, DENNY. & EWING, *Respondent*, JOSEPH CONNELL *et al.*, *Defendants.*[1]

PRINCIPAL AND AGENT (56, 56-1)—LIABILITIES OF AGENT—FRAUD. An agent is liable in tort for false representations of material facts inducing plaintiff to purchase lands of his principal if he knew the statements to be false, or if he made them as positive assertions calculated to convey the impression that he had actual knowledge of their truth, when in fact he had no such knowledge; and he cannot escape liability by claiming that the information was based solely on information furnished by the principal.

FRAUD (4, 5, 22)—MATTERS OF FACT OR OPINIONS—EVIDENCE—SUFFICIENCY. Sales agents who visited the land with a view of accepting the agency and could easily have ascertained that it was alkali and unfit for cultivation, and who knew there was no irrigation system in operation, are liable for false representations as to the character of the soil. and crops that could be grown, and that an irrigation system had been built and was in operation; such representations being more than mere opinion.

Appeal by plaintiffs from a judgment of the superior court for King county, Allen, J., entered May 28, 1919, in favor of one of the defendants, notwithstanding the verdict of a jury rendered in favor of the plaintiff, in an action for rescission. Reversed.

*Burkheimer & Burkheimer*, for appellants..

*Hartman & Hartman*, for respondent.

TOLMAN, J.—This action was commenced in Grant county, upon a complaint alleging fraud in consummating a sale of real estate, and praying for a rescission of the sale and a recovery of the purchase price. A change of venue was had to King county, and there, and before any of the defendants had answered, appellants, who were plaintiffs below, filed an amended

[1]Reported in 191 Pac. 409.

complaint, alleging fraud and misrepresentation in the negotiations leading up to the purchase of the land by them, upon which they relied in making the purchase; that they expended considerable sums of money in buying lumber and materials for buildings, fences and improvements; that they also purchased farm implements, work horses, feed and supplies, and expended their own labor and that of hired help over a considerable period of time, relying upon the representations made as to the character of the land, and before they could discover the falsity of such representations; that the land proved to be worthless for agricultural purposes, for which it was purchased, or for any purpose, and alleged that they had been damaged in the sum of $8,894.85, for which amount, together with interest and costs, they demanded judgment.

After moving to strike the amended complaint, respondents answered by making general denials, and pleading affirmatively

"That the said plaintiffs at all times knew and were advised that this answering defendant was agent only of the defendants Connell and Patten, Trustees, . . . that the said plaintiffs never assumed to hold the answering defendant responsible for any statement, representation, act or deed, save as agent acting for its principal, and the principals . . . were and are known to the said plaintiffs."

A demurrer to this affirmative defense having been overruled and the remaining defendants having answered, the cause proceeded to trial, resulting in a verdict in favor of appellants and against all of the defendants in the sum of $6,632. This verdict was set aside and a new trial granted. Upon the second trial, a verdict against all of the defendants in the sum of eight thousand dollars was rendered. A mo-

tion for judgment *non obstante veredicto* was made, which was denied as to the defendants Joseph Connell and Alfred Patten, Trustees (against whom judgment was rendered on the verdict, from which they have not appealed), and granted as to respondent, and judgment rendered in its favor dismissing the action as to it and awarding it costs. The plaintiffs have appealed from such judgment of dismissal. We are therefore confronted by the single question, Was the respondent, Calhoun, Denny & Ewing, entitled to a judgment notwithstanding the verdict of the jury?

It appears that title to the land sold was in the defendants Joseph Connell and Alfred Patten, Trustees, who resided in Chicago, and who appeared in the transaction with appellants only through their agent, Calhoun, Denny & Ewing, and perhaps other agents located in the vicinity of the land sold. It is not claimed that Connell and Patten were guilty of any active fraud or misrepresentation. Their liability having arisen solely by reason of the acts of their agent, Calhoun, Denny & Ewing, and appellants, in addition, seek to hold Calhoun, Denny & Ewing for its own alleged fraud, under authority of *Garrett v. Sparks Brothers,* 61 Wash. 397, 112 Pac. 501, where it is said:

"It is fundamental that a party, whether acting for himself or another, is liable in damages for his own fraud. The fact that the principal is also liable does not relieve from responsibility the party who actually commits the wrong. In such cases, the liability of the principal can only rest upon the delict of its agent. The party who has been wronged may elect to sue either or both."

Respondent does not dispute the correctness of this rule, but argues that, since the agent is one who is employed by, and authorized to act for, his principal,

third parties knowing him to be such agent, are bound to take notice of the fact that he is so acting for his principal, and if the agent speaks honestly and in good faith from information furnished to him by his principal, with a belief in the truth of his statements, there can be no liability upon the part of the agent, though, if the information furnished by the principal be false and untrue, the principal may be liable. In support of this position respondent cites the following cases, which, so far as the facts there involved appear to go, so hold: *Hillis Logging Co. v. Mescher,* 69 Wash. 454, 125 Pac. 768; *Lipscomb v. Kitrell,* 11 Humphr. (30 Tenn.) 256; *Barton v. Cox,* 176 S. W. (Tex. Civ. App.) 793; *Vertress v. Head & Matthews,* 138 Ky. 83, 127 S. W. 523; *Wimple v. Patterson,* 117 S. W. (Tex. Civ. App.) 1034.

In the case last cited, what we conceive to be the true rule is stated in the following language:

"If, under the circumstances stated, the agent becomes liable to the purchaser for damages suffered by him, it is by force of other principles of law than those which measure and fix the rights of parties to a contract. His liability, under such circumstances, must be measured by the law of torts. For his fraudulent acts he is responsible to the buyer. He is not liable on the contract negotiated by him for his principal, but he is liable for his own fraud and deceit practiced on the purchaser to induce him to enter into the contract. If the fraud or deceit charged consists of false representations as to material facts made to the purchaser, to show a liability on the part of the agent it must be made to appear that he made such representations knowing them to be false, or, as stated by a writer in 20 Cyc. 24, that he made them 'as a positive assertion calculated to convey the impression that he had actual knowledge of their truth, when in fact he was conscious that he had no such knowledge.' It follows, from the principles stated, that when the agent, so acting within the scope of his employment

as to bind his principal, honestly believes representations made by him to induce the purchaser to contract with his principal to be true, he is not liable either on the contract or as for a tort.''

We must, therefore, turn to the record to determine whether or not there was any evidence sufficient to go to the jury upon the question of statements and representations having been made by Calhoun, Denny & Ewing to appellants to induce them to purchase the land in question, with the knowledge that such statements were false; or, if not actually known to be false, were they made as a positive assertion calculated to convey the impression that respondent had actual knowledge of their truth, when in fact it was conscious of the fact that it had no such knowledge, and was by it intended that appellants should rely thereon in making the contemplated purchase?

The witness Elwell, who was employed by Calhoun, Denny & Ewing at the time of the sale, testified that he was an experienced land salesman; that, before his employer accepted the agency of the land, he went over and examined it, reported favorably upon it, and his report, coupled with a like favorable report from the immigration agent of the Chicago, Milwaukee & St. Paul Railway Company induced his firm to accept the agency; that thereafter they were furnished with a technical report made by an engineer from Chicago, and that Calhoun, Denny & Ewing made up the advertising circular from this report. The circular, which seems to have been the first thing to interest appellants, is as follows:

''Alfalfa Land
''*With Water*—$99 an acre on small
payment plan, in State of Washington.
''Public Notice
''Notice is hereby given that our immigration department is about to throw open the first block in a

total area of 20,000 acres of choice alfalfa, farm and fruit land at first prices.

"The tract is located near Corfu, on the main line of the Chicago, Milwaukee & St. Paul Railway, in Grant county, a short distance east from Ellensburg, state of Washington.

"A modern irrigation system has been built and is now in successful operation. Instead of pumping water, the system is an all gravity flow. The source of the water is Moses Lake, Lynn Coulee, the Goose Lake reservoir system which is in reality a chain of smaller lakes, and the canal system of which Crab Creek forms a part. The maximum water supply developed will cover approximately 20,000 acres, the first block of which is now open to sale.

"The price of $99 an acre for land and water is less than half the usual price on many other projects for land and water; and an important feature of this property is that instead of water simply being in prospect, it is already there. The special price is, of course, temporary, and is subject to change without notice. This offer is made to call the attention of the public to the opening of a new era in irrigated land. No stumps or timber to clear.

"The water right provides practically three acre-feet of water for each acre of land, more water than can be used for most crops. On the first block of land, ground water is found at a depth of 10 to 15 feet.

"The surface drainage area directly tributary to Moses Lake, Lynn Coulee and Crab Creek is about 1,000 square miles; while the underground drainage indirectly tributary to the same water channels is 2,124 square miles.

"The chain of reservoir lakes alone, between Moses Lake and this property, will store in reserve approximately 10,000 acre-feet; this in addition to practically 10,000 to 15,000 second-feet flow from the other waterway sources, and accounts for the ample water supply for the property.

"Corfu is a small village and depot located on the 'Milwaukee' main line, on the edge of the property. It has a fine brick school building, shipping station,

general store, post office and grain warehouse, in addition to other buildings and concerns. The distance to Seattle is 178 miles, and to Spokane about 200 miles. The altitude of the town is about 800 feet above sea level. Some of the drainage area is nearly 2,000 feet above sea level.

"The annual rainfall at Corfu averages about 11 inches. On some of the uplands it runs as high as 20 inches. This accounts for the abundant range nearby for stock, much of it free. The length of the growing season averages 180 days.

"The climate is fairly on a par with that of the Puget Sound country, less the rainfall. The temperature ranges from an average of 50 degrees in the winter to a summer average of 75. A few cold days in mid-winter and a few days of higher temperature in mid-summer do not alter the average. The valley is largely sheltered from winds usual in some other sections by a range of hills stretching east and west through the south end of the valley, across the path of the prevailing winds.

"The first block of land resembles a 'meadow,' level and covered mainly by coarse grass and black sagebrush. In the main, the soil is a deep, black loam, much like the truck gardens near Seattle and other large cities. This valley is traversed east to west by two channels of Crab Creek. The slope down the valley averages 12 feet to the mile.

"Crops that thrive under irrigation here are alfalfa, wheat, rye, flax, potatoes, grasses and all kinds of vegetables. Cows, hogs and poultry bid fair to prove a specialty; while apples are well adapted to the slopes. The conditions are considered ideal for grape vineyards.

"Alfalfa growing is demonstrated on identical land nearby, where last year 36 acres ran over seven tons to the acre. Six tons per acre is a reasonable average per year. Plans are being considered for an alfalfa mill at Corfu to cost $7,000.

"The opening of this property to farming will result in great development during the next few years. Early arrivals can secure small productive farms, at original

prices. Opening prices for land and water run $99 an acre. One-fourth cash payment, balance on easy time at 6 per cent. The company will cooperate with settlers in every possible way. Ask for special excursion rates to the property. Apply to

"Calhoun, Denny & Ewing
"Alaska Building, Seattle, U. S. A.
"Sole Agents."

According to appellant's testimony, the oral representations of Elwell and White, another salesman in the employ of respondent, went considerably further than the circular; but, passing that, we think the jury, having before it the circular, the engineer's report from which it was said to have been made, and the testimony of the various witnesses as to the land, its character, soil, productivity and suitability for agricultural purposes, and the existence or non-existence of an adequate irrigation system appurtenant thereto, might have found that respondents, by this circular, made statements which they knew to be false, or which they had no reason to believe to be true, in the following particulars: (a) As to the completion of a modern irrigation system and water being already on the land; (b) as to the soil being deep black loam, much like the truck gardens near Seattle and other large cities; and (c) as to the crops which would thrive thereon, and especially as to the seven tons of alfalfa being grown per acre on identical land nearby. The engineer's report shows that the irrigation system was a contemplated one and uncompleted when that report was made, and appellants testified that, after they went upon the land, there was no water available. The engineer's report fails to say that the land is deep black loam or to tell what the soil consists of, nor does it intimate any similarity between this soil and that of the truck gardens near Seattle, with which appel-

lants, as they resided in Seattle, might be deemed to
have some familiarity, and there was testimony that
it was flooded every winter and spring until well into
the summer, could not be cultivated at all until after
the floods receded, too late in the summer for crop
growing, and when dry enough to cultivate, it imme-
diately hardened like cement, and was so impregnated
with black alkali that it would produce nothing but
grease wood and salt grass, neither being of any value.
And lastly, while speaking generally of oats, wheat,
rye, flax, potatoes and all kinds of vegetables thriving
under irrigation, alfalfa and grasses doing exception-
ally well, and the sloping hillsides being adapted to
apple raising, the report further on refers to the bot-
tom lands being suitable for alfalfa, in such a way as
to somewhat modify the prior general statement, and
nowhere bears out in full the glowing terms of the cir-
cular as to productivity.

Mr. Elwell's testimony shows him to have been en-
gaged in selling Washington lands for fifteen years,
and the abstract shows his opportunity for knowing
the real character of this particular land, as follows:

"I prepared that circular. I have been at the town
of Corfu. Was first there in the spring of 1915. I
would not be sure about that date, whether it was 1914
or 1915. I cannot tell the date for sure, but it was
before I wrote this circular. I think I was at Corfu
twice up to this time. I had been out over the land.
Possibly sixty days elapsed between my two visits just
referred to. I examined the land at that time for the
purpose of drafting this circular. I will correct that
to some extent. I was examining the land with a view
to the firm accepting the agency for the land. I
wouldn't know whether I was going to prepare a cir-
cular or not unless we took the agency. I was there
at least twice before this circular was prepared. I
might possibly have been there more times. It is quite

a little while ago. It is pretty certain that I was there a number of times after that before this was published and before Mr. Lasman bought it.''

From this testimony, coupled with other testimony in the record to the effect that one familiar with alkali lands could readily detect the presence of alkali, black or white, from the appearance of the land and the vegetation growing thereon, the jury might well have drawn its conclusion that the representations contained in the circular were falsely made, or at least so recklessly made, in view of Mr. Elwell's capacity and opportunity to have learned the truth, as to be equivalent to deliberate falsity.

We think the representations made were something more than mere opinion. Whether appellants were qualified to, and did, make an independent investigation, the evidence being very conflicting with regard thereto, was a question for the jury, and the affirmative answer, even though it had been so amended as to allege that the representations were based solely upon information furnished by the principal to the agent, presented an issue which, under the evidence, the jury could and did resolve against respondent.

We therefore conclude that the judgment appealed from must be reversed, with instruction to the trial court to enter judgment on the verdict of the jury.

HOLCOMB, C. J., FULLERTON, MOUNT, and BRIDGES, JJ., concur.