[No. 86220-6. En Banc.]
Argued May 1, 2012. Decided October 18, 2012.

MICHAEL ANNECHINO ET AL., *Petitioners*, v. MICHAEL C. WORTHY ET AL., *Respondents*.

*Michael E. Withey* (of *Law Offices of Michael Withey*), for petitioners.

*Stephen G. Leatham* (of *Heurlin Potter Jahn Leatham & Holtmann*), for respondents.

*Philip A. Talmadge, Sidney C. Tribe,* and *Justin Bristol* on behalf of Richard and Karen Applegate, amicus curiae.

¶1 GONZÁLEZ, J. — This case asks us to decide whether particular officers and employees of a bank owed a quasi-fiduciary duty to particular bank depositors. Michael and Theresa Annechino deposited a large amount of money at a bank specifically to ensure that their savings would be protected by the Federal Deposit Insurance Corporation (FDIC). Depositors and banks generally deal at arm's length and do not owe one another quasi-fiduciary duties, but the Annechinos relied on bank employees' recommendations of how to structure their accounts to meet FDIC coverage rules. Unfortunately, the bank went into receivership, and the FDIC found that nearly $500,000 of the Annechinos' deposits were not insured. The Annechinos allege that individual officers and employees of the bank owed them a duty, the breach of which resulted in their loss. The trial court granted summary judgment in favor of the individual defendants, and the Court of Appeals affirmed.

¶2 We affirm the Court of Appeals. The officers and employees of the bank did not owe the Annechinos a quasi-fiduciary duty.[1] Holding the officers and employees personally liable under these facts would contravene established law regarding liability for acts committed on behalf of a corporation or principal.

## I. FACTS AND PROCEDURAL HISTORY

¶3 In 2008, Michael Annechino, a businessman, was concerned about the safety of his investments and decided to transfer a substantial sum of money to a bank to take advantage of an increase in FDIC coverage for deposit accounts. Annechino contacted the Bank of Clark County to discuss the transfer. Annechino had deposited money with the bank in the past and was a small investor

---

[1] The duty of the bank to the Annechinos is not before us.

with the bank when he and his family lived in Vancouver, Washington. Although the Annechinos had since moved out of state, they still had approximately $1,150,000 in deposits at the bank. Annechino discussed the transfer with respondents Kelli Reynolds, a financial services officer, and Michael Worthy, the chief executive officer and vice chairman of the board. Annechino asked how much additional money the family could deposit and how the accounts could be structured so that the deposits would be fully insured by the FDIC. Reynolds prepared a chart for the Annechinos, providing " 'Recommended Account Structures & FDIC [Coverage].' " Clerk's Papers at 68. According to the chart, the bank could restructure the Annechino accounts to provide a total of $3,000,000 in FDIC coverage. *Id.* Reynolds represented to Annechino that she had reviewed the chart with Worthy and bank Vice President Joan Cooper, and that the chart had their approval and that of other bank officers. Annechino spoke directly with Worthy during this process and claims that Worthy assured him that the Annechinos' deposits would be fully covered by the FDIC. Annechino negotiated a higher interest rate than the family earned for their earlier deposits. Although Annechino is a businessman, he was unfamiliar with the applicable FDIC rules and relied on Reynolds's and Worthy's recommendations.[2]

¶4 After receiving the chart from Reynolds, Annechino responded that he planned on wiring $1,850,000 to the bank to be distributed in accordance with the chart. Annechino also reminded Reynolds of the higher interest rate he had negotiated, writing, "Don't forget my great rate for showing this confidence in the bank! This is everything we have all in your hands!!!!" *Id.* at 71. In the same e-mail, Annechino suggested that one of the accounts be placed in the name of the family trust. Reynolds replied that she could transfer a specific joint account to trust ownership.

---

[2] Reynolds claims she recommended that Annechino independently verify the FDIC coverage summarized in her chart, which Annechino denies. Worthy claims he never assured Annechino that the deposits would be FDIC insured.

¶5 In October 2008, Annechino wired $1,850,000 to the bank, increasing the family's total deposits with the bank to $3,000,000. The Annechinos signed signature cards for each of the seven accounts, which indicated the account numbers and balances.

¶6 On January 16, 2009, the bank went into involuntary receivership, and the FDIC was appointed receiver. The FDIC asserted that nearly $500,000 of the account funds were uninsured. After the bank was taken into receivership, Annechino saw another account chart from the bank, detailing the balances and FDIC coverage of the family's accounts. The typed portion of the chart indicates that account 12009528, a joint account, contained a balance of $1,000,000 and qualified for FDIC coverage up to that amount. Next to the FDIC coverage column, however, someone had handwritten "500,000." *Id.* at 74. Annechino asked Reynolds about the handwritten number, and she replied that the account provided only $500,000 FDIC insurance coverage, although the account balance was $1,000,000. Reynolds said, " 'Oh my God. I did it. I did that to you.' " *Id.* at 65. Reynolds also wrote a letter to the executive vice president of the bank, stating, "It is unfortunate that my interpretation of coverage was not accurate and I am regretful that my expertise was not sufficient to protect our client who trusted us to protect their interests, and seek any options we make [sic] have at our disposal to right this wrong." *Id.* at 76.

¶7 Reynolds claims that when she wrote the letter to her superior she believed she had misinterpreted the FDIC coverage rules but that she later learned that she had interpreted the rules correctly and that the Annechinos' funds would have been fully insured if they had been deposited in accordance with her chart. The cause of the insufficient coverage, according to respondents, was that in an attempt to fulfill Annechino's request that one of the accounts be in the name of the family trust, someone at the bank mistakenly transferred the wrong account. This re-

sulted in account 12009528 being insured for $500,000 less than was indicated on the printed chart. Although the Annechinos signed the signature cards and received account statements during the months before the bank closed, neither they nor the bank noticed the discrepancy. The Annechinos claim that Reynolds's original chart misapplied the FDIC rules, such that the $1,000,000 of their deposits would have been uninsured if they had strictly followed Reynolds's recommendations. The record contains no evidence of malfeasance or self-dealing.

¶8 The Annechinos brought this action against multiple defendants, including Reynolds, Worthy, and Cooper. The Annechinos moved for partial summary judgment against Reynolds and Worthy. Respondents filed a cross motion for partial summary judgment to dismiss claims against Reynolds, Worthy, and Cooper, arguing that they could not be held personally liable for the loss. The Clark County Superior Court denied the Annechinos' motion and granted partial summary judgment in favor of the bank officers and employees. Division Two of the Court of Appeals affirmed, finding that the Annechinos failed to establish that the bank officers and employees were personally liable to the Annechinos. *Annechino v. Worthy*, 162 Wn. App. 138, 252 P.3d 415 (2011). We granted review. *Annechino v. Worthy*, 172 Wn.2d 1020, 268 P.3d 224 (2011).

## II. Issue

¶9 Did the individual bank officers and employees owe the Annechinos a quasi-fiduciary duty?

## III. Standard of Review

¶10 We review summary judgment orders de novo. *City of Sequim v. Malkasian*, 157 Wn.2d 251, 261, 138 P.3d 943 (2006). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. CR 56(c). In

determining whether an issue of material fact exists, we view the evidence in the light most favorable to the non-moving party, in this case the Annechinos. *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008).

## IV. ANALYSIS

■ ■ ¶11 The Annechinos primarily contend that the individual bank officers and employees owed them a quasi-fiduciary duty. "Generally, participants in a business trans-action deal at arm's length; it has been said that an individual has no particular duty to disclose facts nor any particular right to rely on the statements of the party with whom he contracts at arm's length." *Liebergesell v. Evans*, 93 Wn.2d 881, 889, 613 P.2d 1170 (1980). Transactions between a depositor and a bank usually fall into this category. *Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 33 Wn. App. 456, 458-59, 656 P.2d 1089 (1982) (citing *Pigg v. Robertson*, 549 S.W.2d 597, 600 (Mo. Ct. App. 1977); *Richfield Bank & Trust Co. v. Sjogren*, 309 Minn. 362, 244 N.W.2d 648 (1976); *Klein v. First Edina Nat'l Bank*, 293 Minn. 418, 196 N.W.2d 619 (1972); Annotation, *Existence of Fiduciary Relationship between Bank and Depositor or Customer so as To Impose Special Duty of Disclosure upon Bank*, 70 A.L.R.3D 1344, 1347 (1976)).

■ ■ ¶12 Washington law does, however, impose a duty on parties to a business transaction under certain circum-stances. The existence of a fiduciary relationship between the parties may allow one to rightfully rely on the state-ments of the other. *Liebergesell*, 93 Wn.2d at 889. Fiduciary relationships may arise under law, such as in the relation-ship between an attorney and client, while other, quasi-fiduciary relationships may arise in fact. *See id.* at 894-95 (discussing *Boonstra v. Stevens-Norton, Inc.*, 64 Wn.2d 621, 393 P.2d 287 (1964)).

¶13 Referring to the liability of corporate officers and employees or agents, the Annechinos argue that the bank

officers and employees owed them a quasi-fiduciary duty, breached that quasi-fiduciary duty, and are personally liable for that breach.[3] Importantly, whether *the bank* owed the Annechinos a duty is not before us, except insofar as it relates to the individual bank employees' and officers' potential liability.

■ ¶14 Assuming, arguendo, that the bank owed the Annechinos a fiduciary duty, Washington law does not support extending liability to individual bank officers in this case. The cases where we have found officers personally liable for the torts of corporations involved officers who either knowingly committed wrongful acts or directed others to do so knowing the wrongful nature of the requested acts. *See Dodson v. Econ. Equip. Co.*, 188 Wash. 340, 343, 62 P.2d 708 (1936) (president and general manager directly participated in conversion of property); *Johnson v. Harrigan-Peach Land Dev. Co.*, 79 Wn.2d 745, 753, 489 P.2d 923 (1971) (officers participated in fraudulent acts and maintained close control); *State v. Ralph Williams' Nw. Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 322, 553 P.2d 423 (1976) (officer was personally responsible for many of the company's unlawful acts in violation of the Consumer Protection Act, chapter 19.86 RCW); *Grayson v. Nordic Constr. Co.*, 92 Wn.2d 548, 551, 554, 599 P.2d 1271 (1979) (officer drafted and directed the mailing of a brochure that contained deceptive advertising in violation of the Consumer Protection Act).

¶15 Worthy, the bank's chief executive officer, did not commit acts that would make him personally liable if the bank owed the Annechinos a fiduciary duty. Viewing the relevant facts in the light most favorable to the Annechinos, Worthy told Annechino that the bank would ensure FDIC coverage for his family's deposits and reviewed and ap-

---

[3] Although the Annechinos discuss Cooper's involvement in their factual statement, they do not include her in their legal argument regarding personal liability. We therefore affirm dismissal of the Annechinos' claim against Cooper without further discussion.

proved of the erroneous account chart. The Annechinos do not claim that Worthy knew the chart was incorrect or knowingly directed Reynolds's misconduct.[4]

¶16 Under Washington law, Worthy and Reynolds would not be personally liable as employees or agents, either. An employee or agent is personally liable to a third party injured by his or her tortious conduct, even if that conduct occurs within the scope of employment or agency. *Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380, 400, 241 P.3d 1256 (2010); RESTATEMENT (THIRD) OF AGENCY § 7.01 (2006). But "[a]n agent is subject to tort liability to a third party harmed by the agent's conduct only when the agent's conduct breaches a duty that the agent owes to the third party." RESTATEMENT (THIRD) OF AGENCY § 7.02. Furthermore, we have adopted the rule that " 'when the agent, so acting within the scope of his employment as to bind his principal, honestly believes representations made by him to induce the purchaser to contract with his principal to be true, he is not liable either on the contract or as for a tort.' " *Lasman v. Calhoun, Denny & Ewing*, 111 Wash. 467, 470-71, 191 P. 409 (1920) (quoting *Wimple v. Patterson*, 117 S.W. 1034, 1035 (Tex. Civ. App. 1909)). Similar to an authorized agent's protection from liability when dealing on behalf of a disclosed principal, we find that agents are not personally liable for quasi-fiduciary duties that may arise when dealing on behalf of a disclosed principal where the agent does not independently owe a duty to the third party and does not knowingly make misrepresentations.

¶17 The record does not support finding that Reynolds or Worthy independently formed quasi-fiduciary relationships with the Annechinos or that they could otherwise be held liable as agents of the bank. Both Reynolds and Worthy transacted with Annechino on behalf of the bank. More

---

[4] It is unclear whether Reynolds was a bank officer or an employee, but the law regarding corporate officer liability does not support finding her personally liable for the bank's alleged tort because the Annechinos do not claim that she knew the chart was incorrect.

importantly, the Annechinos were aware at the time that they deposited money with the bank that they were dealing with the bank, not with bank employees or officers as individuals. If any quasi-fiduciary relationship existed, the duty was owed by the bank in the first instance and not individually by Reynolds or Worthy.[5] Further, the Annechinos do not allege, nor does the record indicate, that Reynolds or Worthy knowingly made any misrepresentations.

¶18 Under these facts, the individual bank employees and officers are not personally liable to the Annechinos. We do not address the issue of whether personal liability would attach if there were evidence of self-dealing or malfeasance.[6]

## V. CONCLUSION

¶19 Interpreting the evidence in the light most favorable to the Annechinos, there are no facts that support the existence of a quasi-fiduciary duty owed to them by either the bank officers or the bank employees. The individual bank officers and employees are not liable for obligations potentially created on behalf of the bank. Finding otherwise

---

[5] The Annechinos also assert that the bank officers and employees gratuitously assumed a personal duty to the Annechinos. Similar to the claim of quasi-fiduciary duty, however, the Annechinos have failed to establish that any liability would extend to the bank officers and employees, as opposed to the bank alone.

[6] The Annechinos additionally claim that individual officers and employees of a bank owe a duty to depositors under RCW 62A.4-103. The relevant portion of the statute states that parties "cannot disclaim a *bank's* responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure." RCW 62A.4-103(a) (emphasis added). By its terms, the statute applies only to banks, not to their officers or employees, and the Annechinos do not cite relevant authority to the contrary.

could expose employees of banks and other industries to severe personal liability for honest mistakes. We affirm.

MADSEN, C.J., and C. JOHNSON, CHAMBERS, OWENS, FAIRHURST, J.M. JOHNSON, STEPHENS, and WIGGINS, JJ., concur.