IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| WILLIAM MERRIMAN AND COLLEEN MERRIMAN, husband and wife, | ) ) ) | No. 33929-7-III |
| | ) | |
| Appellants, | ) ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| AMERICAN GUARANTEE & LIABILITY INSURANCE COMPANY; PARTNERS CLAIM SERVICES, INC.; BERND MOVING SYSTEMS, INC., a Washington corporation; DOUGLAS A. BERND and JANE DOE BERND; JOHN DOES 1-5, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) ) | |
| YORK RISK SERVICES GROUP, INC., | ) ) | |
| Respondent. | ) | |

SIDDOWAY, J. — William and Colleen Merriman brought a negligence action

against Bernd Moving Systems after a fire at Bernd's storage warehouse destroyed over

$300,000 worth of the Merrimans' property. When the Merrimans learned through

litigation that Bernd had substantial insurance protecting its storage customers against

property loss that had never been disclosed by Bernd's insurer, its adjuster, or the

adjuster's local agent, they amended their complaint to assert claims against all three

companies. They also moved, successfully, for certification of a class action.

Settlements were reached between the class and Bernd, the insurer, and the adjuster's local agent.

No settlement was reached with the adjuster, York Risk Services Group (York), and the trial court eventually decertified the class and granted summary judgment dismissal of the Merrimans' claims against it. We reverse the dismissal of the Merrimans' claims against York for insurance bad faith, negligent misrepresentation, and non per se violations of Washington's Consumer Protection Act (CPA).[1] We also reverse dismissal of the Merrimans' negligence claim in light of York's broad contractual claims administration undertakings, which were intended in part to benefit insureds. Finally, having reinstated two claims that were never decertified as class actions, we direct the trial court to reexamine its decertification of the negligent misrepresentation, negligence, and non per se CPA claims.

## FACTS[2] AND PROCEDURAL BACKGROUND

On August 5, 2012, a storage warehouse in Yakima owned and operated by Bernd Moving Systems burned to the ground. In addition to destroying the warehouse itself, the fire destroyed Bernd's personal property and the property of 38 of its customers who stored property in the warehouse—among them, the Merrimans.

Over $300,000 worth of the Merrimans' property was destroyed in the fire.

---

[1] Chapter 19.86 RCW, whose violation can support a civil action as provided by RCW 19.86.090.

[2] As with all appeals from a summary judgment, we review the evidence and inferences in the light most favorable to the nonmoving party.

2

Before placing property in storage at the Bernd warehouse, the Merrimans had been told by Doug Bernd that their property would be fully insured. Following the fire, they spoke with a representative of Bernd who told them they would be contacted by insurance representatives.

Bernd was insured by American Guarantee & Liability Insurance Company (American Guarantee). Its commercial insurance policy provided many types of property and liability coverage. American Guarantee engaged York to not only adjust claims for the Bernd warehouse fire, but to more broadly administer the entire review, adjustment, settlement, and payment process under a preexisting third party administrator agreement between its parent company and York.

York, in turn, engaged Partners Claim Services, Inc. (Partners) to serve as its "'boots on the ground'" for the Bernd claims administration engagement. Br. of Resp't at 1. It was Partners whose representatives communicated with the Merrimans and other insurance claimants.

Within two days of the fire, York's field adjuster had reviewed Bernd's insurance policy with American Guarantee and seen that property provisions of the policy insured not only Bernd's business personal property from loss or damage but also covered "Personal property of others in your care, custody and control." Clerk's Papers (CP) at

2037, 1881.[3] The policy form went on to provide, "[O]ur payment for loss of or damage to personal property of others will only be for the account of the owner of the property." *Id.* Blanket limits of Bernd's business and personal property coverage were $777,500, and $435,000 of coverage for property loss was available under a commercial inland marine policy if Bernd were found liable for the loss.

American Guarantee would ultimately concede that Bernd's policy covered the Merrimans' and other storage customers' property loss but it never disclosed the coverage to the Merrimans. It claimed it relied on York to perform its "contractual job duties," including to make required disclosures of coverage to potential insureds. CP at 2760-61, 2848-49.

York agreed that covered business personal property included customer property stored at the warehouse, but it did not provide a copy of the policy to Partners nor inform Partners of coverage for those property owners. Instead, York instructed Partners to tell property owners that Partners did not know what Bernd's coverages were, or whether its policy would apply to their loss. It further instructed Partners to tell property owners they should file a claim under their own homeowner's insurance, which might expedite payment for their loss. During discovery, York's CR 30(b)(6) designee admitted that in light of the limited information it provided to Partners, no property owner could expect to

---

[3] Multiple copies of portions of the policy are in the record. We rely on what is represented to be a complete, 288-page copy, ordered to correspond with the schedule of forms and endorsements in the policy itself, which is attached to a declaration of plaintiffs' counsel. *See* CP at 174-461.

4

get a full explanation of the coverage provisions in Bernd's policy.

Mr. Merriman's communications about Bernd's policy's coverage for the Merrimans' property loss began with a call from Liz Bowers, a Partners employee, 12 days after the fire. In contacting property owners, Ms. Bowers informed them she was calling on behalf of York, who was managing claims on behalf of the insurance company. She told Mr. Merriman she would be handling the Merrimans' claim for their property loss. She initially told him she would send him forms for preparing an inventory and hoped to meet with all of the property owners and take them through the claim process. Shortly thereafter, however, she told Mr. Merriman not to bother with the inventory because there would most likely be no coverage under Bernd's policy. In another, later call, she repeated it would be a waste of time to put together an inventory because there would likely be no coverage for the Merrimans' goods under Bernd's policy. She left Mr. Merriman with the impression that the couple's only source of recovery would be through their own homeowner's policy. Their homeowner's policy covered only $15,000 of their loss.

After learning that the warehouse fire was likely caused by a cigarette left burning by a Bernd employee, the Merrimans sued Bernd for negligence. Through discovery, the Merrimans obtained a copy of Bernd's policy. They learned it included a $3 million limit on liability coverage. But they also learned for the first time of the earlier undisclosed property coverage, which applied whether or not Bernd was at fault. They amended their

5

complaint to address the failure to disclose the coverage, naming American Guarantee, York, and Partners as additional defendants and framing a later complaint as a class action. The trial court granted the Merrimans' motion to certify a class action.

Partners settled a couple of months after entry of the order certifying the class action. The fairness and reasonableness of its settlement was approved by the court.

While American Guarantee conceded that Bernd's policy covered the Merrimans' and other storage customers' property, it, and York, have always contended that Bernd's customers were not insureds with first party claims, but were instead third party claimants, and that only Bernd could have made a claim for their property losses. York also contended that as an adjuster rather than an insurer, it could not be sued for insurance bad faith and did not owe any of an insurer's statutory or regulatory duties to insureds.

After motions for summary judgment resulted in the dismissal of some of the claims asserted against York—those characterized as "insurance" claims—York moved to decertify the class as to the remaining claims against it, arguing that liability for those claims (negligent misrepresentation, constructive fraud, and non per se CPA claims) were individualized. The trial court granted the motion. York then moved again for summary judgment of the three remaining claims, and the court granted the motion.

American Guarantee never sought decertification. Instead, it reached a settlement with the class that the court found to be fair and reasonable in November 2015.

6

The Merrimans appeal.

ANALYSIS

The Merrimans appeal dismissal of their claims against York for insurance bad faith, negligent misrepresentation, negligence, and violation of the CPA. They also appeal decertification of the class.

We first address a threshold issue of whether the Merrimans' claim under the property provisions of the policy is a first party claim by an insured or a third party claim. We then address the dismissal of their claims for insurance bad faith, negligent misrepresentation, negligent claims handling, and violation (per se and non per se) of the CPA, in the order stated. We conclude with their challenge to the decertification of the class.

I. The Merrimans' claim is a first party claim, as an insured

*Standards of review, interpretation, and construction*

When resolving issues involving the interpretation of an insurance contract, summary judgment is appropriate unless relevant terms of the contract are ambiguous and the parties introduce conflicting evidence to clarify the ambiguity. *Nat'l Gen. Ins. Co. v. Sherouse*, 76 Wn. App. 159, 162, 882 P.2d 1207 (1995). The parties did not offer conflicting evidence to resolve an ambiguity below; both agreed there and agree on appeal that Bernd's policy may be interpreted and construed as a matter of law. We

review an order denying summary judgment de novo, engaging in the same inquiry as the trial court. *Ruvalcaba v. Kwang Ho Baek*, 175 Wn.2d 1, 6, 282 P.3d 1083 (2012).

A contract of insurance should be given a fair, reasonable and sensible construction, consonant with the apparent object and intent of the parties, a construction such as would be given the contract by the average person purchasing insurance. *Morgan v. Prudential Ins. Co. of Am.*, 86 Wn.2d 432, 434, 545 P.2d 1193 (1976). If the policy language is clear and unambiguous, the court may not modify the contract or create an ambiguity where none exists. *Id.* at 435. However, where the clause in the policy is ambiguous, a meaning and construction most favorable to the insured must be applied, even though the insurer may have intended another meaning. *Id.* (citing *Glen Falls Ins. Co. v. Vietzke*, 82 Wn.2d 122, 508 P.2d 608 (1973)).

"The 'insured' under a contract of insurance is the person or entity that will receive a certain sum upon the happening of a specified contingency or event." 3 STEVEN PLITT ET AL., COUCH ON INSURANCE 3D § 40:1, at 40-3 (2016). *Black's* similarly defines "insured" as "[s]omeone who is covered or protected by an insurance policy." BLACK'S LAW DICTIONARY 928 (10th ed. 2014).

"The insured may be named within the policy or may be identified by description such as 'employee,' 'dependent,' 'resident,' or 'member' of a household, 'owner,' or 'eligible debtor.'" PLITT, *supra*, § 40:3, at 40-6 (footnotes omitted). If the identification of who is insured requires interpretation and is susceptible of different conclusions, "'the

8

one will be adopted most favorable to the insured; and will be liberally construed in favor of the object to be accomplished.'" *Dennis v. Great Am. Ins. Co.*, 8 Wn. App. 71, 74, 503 P.2d 1114 (1972) (quoting *Jack v. Standard Marine Ins. Co.*, 33 Wn.2d 265, 271, 205 P.2d 351 (1949). Careful consideration of any definition of "insured" in the policy must be made. PLITT, *supra*, §40:1, at 40-4.

"Insured" is undefined by Bernd's policy for the personal property coverage that remains at issue in this case. Bernd's policy consists of a number of policy forms, each addressing a particular type of coverage. Only one of the forms, the commercial general liability coverage form, contains a "Who is an Insured" section. *See* CP at 278-296, specifically at 286.

By contrast, the coverage form relevant here, the building and personal property coverage form, speaks of "Covered Property" rather than addressing who is an "Insured." *E.g.*, CP at 224. Section 5 of the form, "Coverage Extensions," provides at subsection (b) that Bernd "may extend the insurance that applies to Your Business Personal Property to apply to . . . (2) Personal property of others in your care, custody or control," and further states, "Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property." CP at 230. Bernd secured such an extension of coverage, addressed by a property basket coverage endorsement, which amended the building and personal property coverage form as follows:

9

> The following paragraph is added to **b. Your Business Personal Property**
> of paragraph **1. Covered Property** of section **A. Coverage**:
>
> Personal property of others in your care, custody and control. However,
> our payment for loss of or damage to personal property of others will only
> be for the account of the owner of the property.

CP at 198.

This language clearly and unambiguously includes as covered property personal property of the Merrimans and other customers that was in Bernd's care, custody and control at the time of the covered loss.

The statement that "our payment for loss of or damage to personal property of others will only be for the account of the owner of the property" also appears to clearly and unambiguously contemplate that American Guarantee will pay the loss to the owner of the property—unlike policy language seen in other cases, such as "'[L]oss shall be *adjusted with the named insured* for the account of the owners of the property,'" language used in the policy at issue in *Stanley Fine Furniture, Inc. v. North River Insurance Co.*, 411 So. 2d 210, 211 (Fla. Dist. Ct. App. 1982) (emphasis added).[4]

York argues, however, that one can infer from the types and limits of coverage Bernd purchased that the building and personal property coverage was only intended to

---

[4] In *Stanley Fine Furniture*, the <u>insurer</u> successfully argued in the trial court that the named insured was not the real party in interest for purposes of a policy's coverage of property of others, leading the trial court to dismiss the named insured's claims without prejudice to the other property owners' ability to bring suit. *Stanley*, 411 So. 2d at 211. The appellate court reversed, citing the language that loss for property of others "shall be adjusted with the named insured" language.

10

cover the replacement cost of Bernd's building and its own property. But the policy covered any loss, not just a total loss, and the endorsement modifying the covered property section of the coverage form plainly extends coverage to property of others. Policy limits are not required to cover all possible loss, and Washington courts allow an insurer to "limit[ ] its liability to a specified dollar amount" even when that limit prevents "full compensation for insureds." *Certain Underwriters at Lloyd's, London v. Valiant Ins. Co.*, 155 Wn. App. 469, 478, 229 P.3d 930 (2010).

York also argues that if the Merrimans and other storage customers were insureds, American Guarantee would owe conflicting duties to Bernd and the other insureds, because limits of the coverage fell short of their combined loss. But this is not a rare occurrence, and it is addressed by case law. *See, e.g., Allstate Ins. Co. v. Ostenson*, 105 Wn.2d 244, 246, 713 P.2d 733 (1986) (interpleader was used, and the court was asked to determine whether a "per person" limitation under policy would control over the general rule of distributing on a pro rata basis in accordance with the amount of damage suffered by each claimant).

York next points to the loss payment section of the building and personal property coverage form, which provides, in part, that American Guarantee "may adjust losses with the owners of lost or damaged property if other than you," and thereby satisfy "your claims against us for the owners' property." CP at 233 (§ 4(e)). (Here, as elsewhere, "you" and "your" mean "Bernd," which we substitute hereafter.) This paragraph of the

11

loss payment section advances York's argument, but language elsewhere in the section undercuts its position. Paragraph (e) allows American Guarantee to pay other owners "their financial interest in the Covered Property" and paragraph (d) states that the insurer "will not pay [Bernd] more than [Bernd's] financial interest in the Covered Property"— contradicting York's contention that American Guarantee could pay Bernd for both its own financial interest and whatever additional amount (within limits) was needed to cover the financial interests of its customers. *Id.* (§ 4(d)).

York also points to paragraph 4(f) of the loss payment provision, which allows American Guarantee to defend Bernd "against suits arising from claims of owners of property." *Id.* According to York, this language means that other owners must assert claims for covered property against Bernd. But York has never identified a legal theory the owners could advance if Bernd was not at fault for their property loss. As the Merrimans point out, under Bernd's comprehensive general liability coverage, they and other storage customers asserted viable negligence claims against Bernd, which could be enforced against any of Bernd's assets, including its rights to payment under other coverages. Perhaps that is what the paragraph envisions.

Both American Guarantee and the Merrimans have sometimes analogized the building and personal property coverage to warehouseman's policies. The Merrimans have pointed to § 68:40 of *Couch on Insurance*, which states:

> Where the bailee or warehouseman has effected insurance in favor of the bailor, the latter is entitled to the proceeds to the extent of his or her

> insurable interest, without regard to whether the bailee or warehouseman procured the policy voluntarily, or pursuant to an agreement, express or implied, to carry insurance. . . . A person having possession of goods of another may insure for the benefit of the latter without authority, and the latter may adopt the policy so as to recover insurance collected, in proportion to the value of the owner's goods lost.

Reply Br. at 6 & n.5; 5 PLITT, *supra*, § 68:40, at 68-63. The Merrimans cite cases from other jurisdictions supporting a bailor's right to sue the insurer for coverage. *See id.*; *cf. Clausen v. Columbia Nat. Ins. Co.*, 1 Neb. App. 808, 816, 510 N.W.2d 399, (1993) (insurer did not challenge property owner's right to bring third party claim under same "covered property" provision at issue here; a directed verdict should have been entered in favor of property owner as to the property being within the "care, custody and control" of named insured).

American Guarantee, whose policy interpretation is embraced by York, also raised warehouseman's insurance in the trial court, directing the court to § 242:82 of the *Couch* treatise, which explains that "[t]he bailee's policy of insurance may be so worded that it does not give rise to any cause of action in favor of the bailor," and that "where a policy contains a clause making the loss payable to and adjustable with the bailee . . . it may be inferred that the insurer does not intend to assume a direct liability to the owners." Report of Proceedings at 219; 17 COUCH, *supra*, §242:82. American Guarantee's building and personal property coverage form does not say that loss is "payable to and adjustable with" Bernd, however—unlike the policy in *Stanley*, 411 So. 2d 210.

13

A clear lesson from these authorities is that no presumption can be made that "other owners" whose property is covered by this type of policy are first party claimants or that they are third party claimants. Policies can be, and are, written both ways. When interpreting an insurance policy, we consider the "policy as a whole," harmonizing conflicting provisions to give effect to the whole policy. *Kut Suen Lui v. Essex Ins. Co.*, 185 Wn.2d 703, 710, 375 P.3d 596 (2016). Considering the building and personal property coverage form and the property basket coverage endorsement as a whole, we come to the same conclusion as did the trial court: the policy is most reasonably read to include all owners of covered property as insureds, thereby making the Merrimans and other storage customers' first party claimants.[5] At worst, the policy is ambiguous and must be construed in the property owners' favor, which leads to the same result.

II. <u>The Merrimans can assert a claim for insurance bad faith against York</u>

"The duty of good faith has been imposed on the *insurance industry* in this state

---

[5] Washington's insurance commissioner has adopted insurance regulations that include the defined term "first party claimant" rather than "insured." WAC 284-30-320. "First party claimant" is defined to mean

> an individual, corporation, association, partnership or other legal entity asserting a right as a covered person to payment under an insurance policy or insurance contract arising out of the occurrence of the contingency or loss covered by a policy or contract.

WAC 284-30-320(6). If the regulation is construed to mean "asserting a right" that the individual or entity has *in fact*, rather than "asserting a right" that the individual or entity merely claims to have (viz., a putative first party claimant), then the terms "first party claimant" and "insured" mean the same thing for present purposes. However construed, the Merrimans are first party claimants.

by a long line of judicial decisions." *Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 386, 715 P.2d 1133 (1986) (emphasis added). The legislature has imposed the duty as well, having adopted RCW 48.01.030 in 1947. *Id.*; LAWS OF 1949, ch. 190, § 26. That statute provides:

> The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, their providers, and their representatives rests the duty of preserving inviolate the integrity of insurance.

RCW 48.01.030.

Application of the statute presents a question of statutory interpretation, which we review de novo. *State v. Bradshaw*, 152 Wn.2d 528, 531, 98 P.3d 1190 (2004). We begin by looking at the plain meaning of the statute as expressed through the words themselves. *Tesoro Ref. & Mktg. Co. v. Dep't of Revenue*, 164 Wn.2d 310, 317, 190 P.3d 28 (2008). If the statute's meaning is plain on its face, then we apply that plain meaning. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). Only if the language is ambiguous do we look to aids of construction, such as legislative history. *Id.* at 110-111.

RCW 48.01.030 unambiguously applies to "the business of insurance," imposing requirements on "all persons," and rests the duty of preserving inviolate the integrity of insurance upon, among others, "[the] representatives" of the insurer. "Person" is defined by RCW 48.01.070 to mean "any individual, company, insurer, association, organization, reciprocal or interinsurance exchange, partnership, business trust, or corporation." As an

15

adjuster contracted by American Guarantee to act as its claims administrator, York was, at all relevant times, a "person" engaged in "the business of insurance" and a representative of American Guarantee.

York contends that despite this broad language, a common law bad faith claim is available only against an insurer. Its only authority is language from *Tank* and the fact that claims-handling regulations adopted by the insurance commissioner apply to insurers, not adjusters. *See* chapter 284-30 WAC.

*Tank* involved the application of the duty of good faith to an insurer. The language York cites appears in a section of the opinion in which the court "focus[ed] on . . . [ ]the evolution of the duty of good faith imposed on insurers." *Tank*, 105 Wn.2d at 385. The fact that a case involving an insurer focused on insurers is unsurprising. It does not signal any retreat from case law imposing the duty of good faith "on the insurance industry," *id.* at 386, or any narrowing construction of RCW 48.01.030 that imposes the duty on "all persons" engaged in "the business of insurance."

As for the claims handling regulations, the insurance commissioner is powerless to narrow the plainly broad language of RCW 48.01.030. In choosing to focus regulation on insurers, the commissioner did not purport to narrow the statutory duty of good faith. The regulation provides that "acts performed, whether or not specified herein, may also be deemed to be violations of specific provisions of the insurance code or other regulations." WAC 284-30-310.

16

No. 33929-7-III
*Merriman v. Am. Guar. & Liab. Ins. Co., et al.*

RCW 48.01.030 unambiguously applies to insurance adjusters. A federal court came to the same conclusion in *Lease Crutcher Lewis Wa., LLC v. National Union Fire Insurance Co. of Pittsburgh*, No. CO8-1862RSL, 2009 WL 3444762 (W.D. Wash. Oct. 20, 2009) (court order).[6]

### III. The Merrimans assert a viable negligent misrepresentation claim

The Merrimans asserted a claim for negligent misrepresentation.[7] "A plaintiff claiming negligent misrepresentation must prove by clear, cogent, and convincing evidence that (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages." *Ross v. Kirner*, 162 Wn. 2d 493, 499, 172 P.3d 701, (2007). York defends the trial court's dismissal of the

---

[6] Were the language not plain, we could rely for the breadth of the statute's application on legislative history. In 1995, the legislature added the language "their providers," in order to capture the activities of "cappers"—persons who "acting under an agreement or understanding that they will receive a pecuniary benefit, refer claimants with real or imagined claims, injuries, or property damage to service providers." LAWS OF 1995, ch. 285, § 1, § 17.

[7] York contended below and contends on appeal that the Merrimans did not plead a negligent misrepresentation claim. But the trial court concluded otherwise when it initially denied York's motion for summary judgment dismissal of that claim. Since the trial court could have permitted amendment or even deemed the complaint amended to conform to evidence and arguments advanced in the summary judgment briefing, we consider the issue moot.

negligent misrepresentation claim on appeal solely on the basis of the Merrimans' failure to demonstrate that York owed a duty to them and other property owners. Br. of Resp't at 30.

A defendant may "participate" in making a negligent misrepresentation without being in direct communication with the plaintiff. In *Haberman v. Washington Public Power Supply System*, 109 Wn.2d 107, 161, 744 P.2d 1032, 750 P.2d 254 (1987), for example, investors stated a claim for negligent misrepresentation against professionals who made and "participated in making" negligent misrepresentations in official statements and annual reports. The Washington Supreme Court held that it was enough to state a claim that the professionals "supplie[d] the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them." *Id.* at 163 (quoting RESTATEMENT (SECOND) OF TORTS, § 552 cmt. h) (AM. LAW INST. 1977); *and see Johnson v. Harrigan-Peach Land Dev. Co.*, 79 Wn.2d 745, 751, 489 P.2d 923 (1971) (imposing liability on corporate principals who "knew and approved" representations made by sales representatives). Here, the Merrimans presented evidence that York instructed Partners to provide misleading or misleadingly limited information.

Ordinarily, an omission alone cannot constitute negligent misrepresentation, since a plaintiff must justifiably rely on a misrepresentation. *Ross*, 162 Wn.2d at 499. But if a party has a duty to disclose information, the failure to do so can constitute negligent misrepresentation. *Van Dinter v. Orr*, 157 Wn.2d 329, 333, 138 P.3d 608 (2006). A duty

18

to disclose in a business transaction arises if, among other circumstances, disclosure is necessary to prevent a partial or ambiguous statement of facts from being misleading. *Id.* at 334 (citing *Colonial Imports, Inc. v. Carlton Nw., Inc.*, 121 Wn.2d 726, 731, 853 P.2d 913 (1993)). In *Colonial Imports* our Supreme Court endorsed the notion that the duty arises when the facts are peculiarly within the knowledge of one person and could not be readily obtained by the other. Colonial, 121 Wn.2d at 731-32 (noting that Washington adopted the *Restatement (Second) of Torts* as the standard governing claims of negligent misrepresentation in *Haberman*, 109 Wn.2d at 161-62).

A party is subject to the same liability for nondisclosure of a fact it knows may justifiably induce another to refrain from acting in a business transaction as it would be for representing the nonexistence of the undisclosed matter, if it is under a duty to exercise reasonable care to disclose the matter. *Colonial*, 121 Wn.2d at 731 (citing RESTATEMENT (SECOND) OF TORTS § 551(1)). Among circumstances in which a party to a business transaction is under a duty to exercise reasonable care to disclose a matter is "facts basic to the transaction, if [the party] knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." RESTATEMENT (SECOND) at § 551(2)(e).

Washington law provides that "[n]o insurer shall fail to fully disclose to first party claimants all pertinent benefits, coverages or other provisions of an insurance policy or

19

insurance contract under which a claim is presented." WAC 284-30-350(1). Reasonable jurors could find that York knew that if it did not provide property owners with the information about policy coverage and claims process to which they were entitled under Washington law, then no one would—because American Guarantee was relying on York to make the disclosure. Jurors could reasonably find that the coverage for the personal property of others provided by Bernd's policy was a fact basic to the insurance claim transaction with Bernd's customers. They could reasonably find that customers told that York was handling property owners' claims, and that Partners was assisting York, would reasonably expect disclosure of policy provisions. They could reasonably find that property owners would foreseeably abandon the effort to make a claim under Bernd's policy if left with the impression that they would need to look to their own homeowners' policies for coverage.

Because the common law imposes liability for negligent misrepresentation under such circumstances in all business transactions, York's status as an independent adjuster engaged by American Guarantee does not exempt it. The Merrimans state a viable claim for negligent misrepresentation.

IV. As insureds intended to benefit from York's undertakings in the third party administrator agreement, the Merrimans assert a viable negligence claim

The Merrimans also assert a claim for negligence, specifically, negligent claims handling. A claim for negligent claim handling exists in Washington. In *First State Insurance Co. v. Kemper National Insurance Co.*, 94 Wn. App. 602, 612-13, 971 P.2d

953 (1999), the court held that the plaintiff's claim for negligence against an insurer was not subsumed within its claim for common law bad faith because "a party may fail to use ordinary care yet still not act in bad faith."

York does not dispute that negligence and bad faith claims are distinct, but argues that unlike the defendant-insurer in *First State*, York was a mere adjuster, owing no duty to the Merrimans and Bernd's other customers.

> By statute, an "[a]djuster"
>
> means any person who, for compensation as an independent contractor or as an employee of an independent contractor, or for fee or commission, investigates or reports to the adjuster's principal relative to claims arising under insurance contracts, on behalf solely of either the insurer or the insured.

RCW 48.17.010(1). An "[i]ndependent adjuster"—which York was here—"means an adjuster representing the interests of the insurer." RCW 48.17.010(1)(a).

Nothing in the licensing definition of an adjuster prohibits or makes it unlawful for the adjuster to exercise additional authority on behalf of its principal if its agreement with the principal grants it additional authority. *United Truck Lines v. Emp'rs Mut. Cas. Co.*, 44 Wn.2d 520, 522-23, 268 P.2d 1014 (1954). There is substantial evidence that York acted as more than an adjuster in this case.

York's contract with American Guarantee identified York as a third party claims administrator and the scope of its duties was broad, including to "[p]romptly and thoroughly review, process, Adjust, settle and pay Claims under the Policy in full compliance with (1) this Agreement, (2) the Policy, and (3) all applicable legal and

21

regulatory requirements." CP at 2491. The duration of York's responsibility covered the entire process of administration, from beginning to end: it promised to "provide . . . services" and "perform . . . duties" for claims under American Guarantee's policies, and to carry out that responsibility for all promised services "from the date of first report until final resolution." *Id.*

American Guarantee's CR 30(b)(6) designee testified that American Guarantee looked to York to tell property owners of the provisions of the insurance policy within 30 days of the fire and to advise them of the claims investigation and inventory process, and of York's responsibilities to provide support and assistance in that process. *See* Br. of Appellant at 9 (citations to testimony). But York did not fulfill the insurer's duties under the Washington insurance code and regulations that it took on under its agreement with American Guarantee—so no one did. *See id.* at 10-11 (citing evidence). American Guarantee always asserted that York was at fault for any mishandling of the property owners' claims.

In a negligence action, in determining whether a duty is owed to the plaintiff, the court considers "logic, common sense, justice, policy, and precedent, as applied to the facts of the case." *Centurion Props. III, LLC v. Chi. Title Ins. Co.*, 186 Wn.2d 58, 65, 375 P.3d 651 (2016). In *Centurion*, our Supreme Court began its analysis by considering

22

No. 33929-7-III
*Merriman v. Am. Guar. & Liab. Ins. Co., et al.*

the duties owed by the type of defendant (in *Centurion*, a title insurer) in other Washington cases. *Id.* at 66. We therefore begin with other Washington cases as well.[8]

*Washington cases addressing adjuster liability*

The Merrimans contend that the decision of this court in *Aldrich & Hedman, Inc. v. Blakely*, 31 Wn. App. 16, 639 P.2d 235 (1982) has already recognized a Washington adjuster's duty to an insured. In that case, the adjuster undertook to hire a contractor to repair an insured's damaged home. Deviating from its usual procedures, the adjuster hired an individual, Ted Erwin, who was unlicensed and unbonded. *Id.* at 17-18. He proved to be unqualified, and was ordered to stop construction by the building inspector. *Id.* The adjuster "considered itself responsible for what happened" and obtained a bid to complete necessary repairs from another contractor. *Id.* at 18. In that respect, the duty of the adjuster was not at issue in the trial court or on appeal. *Id.*

---

[8] At issue is only whether a duty exists that will support a negligence claim. We do not perceive any issue under the independent duty doctrine, discussed by the dissent, because no party has suggested that York's third party administrator agreement gave rise to *contractual* duties owed by York to the Merrimans from which a tort duty would have to be independent. York denies owing any duty whatsoever to the Merrimans.

The court's discussion affirming dismissal of negligence claims against an insurer's employee-adjuster in *International Ultimate, Inc. v. St. Paul Fire & Marine Insurance Co.*, 122 Wn. App. 736, 758, 87 P.3d 774 (2004) is so fleeting as to be inscrutable. To read it as suggesting that the tort liability of an agent is limited to conversion situations involving corporate officers, *see id.*, cannot be correct. "Under Washington law . . . [a]n employee or agent is personally liable to a third party injured by his or her tortious conduct, even if that conduct occurs within the scope of employment or agency." *Annechino v. Worthy*, 175 Wn.2d 630, 638, 290 P.3d 126 (2012).

23

The litigation that ensued was brought by a contractor engaged by <u>Mr. Erwin</u> to finish the needed repairs, who sued the homeowner, the insurer, and the adjuster for the cost of the repairs when Mr. Erwin failed to pay. *Id.* at 18-19. Only the homeowner was found liable for a small amount of work that went beyond the loss indemnified by her policy. *Id.* at 19.

It was in making an equitable award of attorney fees to the homeowner for her successful defense of most of Aldrich's claim that the trial court applied the ABC rule[9] and concluded that the adjuster's negligence subjected the homeowner to the litigation. *Id.* at 19-20. In making the equitable award of fees, the trial court necessarily found and this court necessarily reviewed, whether the adjuster's wrongful act or omission toward the insured homeowner exposed her to Aldrich's suit. In affirming that it did, the decision states, "[T]his litigation came about only because of [the adjuster's] negligence—not through the fault of [the homeowner] or [the insurer]." *Id.* at 20.

While *Aldrich* recognized a duty on its facts, it cannot reasonably be read to create a general duty of care owed by adjusters to insureds. The result is best explained as an application of the common law duty of reasonable care arising when a defendant undertakes to render services on which a plaintiff reasonably relies, including relying on

---

[9] "ABC" describes the elements necessary under the rule giving rise to the equitable right to recover attorney's fees: "(1) a wrongful act or omission by A towards B; (2) such act or omission exposes or involves B in litigation with C; and (3) C was not connected with the original wrongful act or omission of A towards B." *Aldrich*, 31 Wn. App. at 20.

the defendant to perform the services nonnegligently. In *Roth v. Kay*, this court observed, quoting Judge Benjamin N. Cardozo, "'It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.'" 35 Wn. App. 1, 4, 664 P.2d 1299, (1983) (quoting *Glanzer v. Shepard*, 233 N.Y. 236, 239, 135 N.E. 275, (1922)). The principle applies in voluntary rescue cases. *Brown v. MacPherson's, Inc.*, 86 Wn.2d 293, 299, 545 P.2d 13 (1975); *Meneely v. S.R. Smith, Inc.*, 101 Wn. App. 845, 859-60, 5 P.3d 49 (2000) (by voluntarily promulgating industry wide safety standards relied on by manufacturers, trade association assumed duty to warn that they created risk of injury to a particular demographic); *Roundtree Villas Ass'n v. 4701 Kings Corp.*, 282 S.C. 415, 423, 321 S.E.2d 46 (1984) (when lender undertook to repair roof defects, a common law duty to use due care arose).

The American Law Institute's most recently approved treatment of liability for pecuniary loss from the negligent performance of services imposes liability on an actor who, in the course of its business, is relied on to perform a service for the benefit of the plaintiff—although not under contract with the plaintiff—and negligently causes pecuniary loss. RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR ECONOMIC HARM § 6 (AM. LAW INST., Tentative Draft No. 2, 2014).[10] In essence, the *Restatement (Third) of Torts* recognizes liability for negligently performed services in the same narrow

---

[10] Section 6 provides, in its entirety:

circumstances in which liability for negligent misrepresentation is recognized, but imposes liability for negligently performed services that cannot be characterized as negligent statements. *Id.*, cmt. The Washington decision in *Estes v. Lloyd Hammerstad, Inc.*, 8 Wn. App. 22, 503 P.2d 1149 (1972) is the basis for one of its illustrations. *See* RESTATEMENT (THIRD) OF TORTS, § 6, Reporter's Note (discussing Illustration 3). In *Estes*, a real estate broker promised to arrange for transfer of fire insurance upon the sale of a home, thereby making himself an agent of the buyer and creating a duty.

A second decision involving a duty owed by an adjuster is *Jones v. Allstate Insurance Co.*, 146 Wn.2d 291, 45 P.3d 1068 (2002), in which our Supreme Court held that Allstate could be vicariously liable for its lay employee-adjuster's negligent performance of services on which a third party claimant relied. Much of the decision

---

(1) One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, performs a service for the benefit of others, is subject to liability for pecuniary loss caused to them by their reliance upon the service, if he fails to exercise reasonable care in performing it.

(2) The liability stated in Subsection (1) is limited to loss suffered
    (a) by the person or one of a limited group of persons for whose benefit the actor performs the service; and
    (b) through reliance upon it in a transaction that the actor intends to influence.

(3) A plaintiff's recovery under this Section is subject to the same rules of comparative responsibility that apply to other claims of negligence.

(4) This Section does not recognize liability for negligence in the course of negotiating or performing a contract between the parties.

26

deals with the issue, not present here, of whether the adjuster's actions constituted the practice of law. But both the majority and dissenting opinions also addressed the separate issue of whether the adjuster owed a duty to the claimant, and both concluded that on the facts of the case, she did: the claimant was "at least one of the intended beneficiaries of the transaction to which [the adjuster's] advice pertained." *Id.* at 307 (majority); *and see* 319 (Madsen, J., dissenting). There was no suggestion that adjusters owe a general duty; instead it was the nature and extent of the assistance provided by Allstate's adjuster that supported the conclusion that the plaintiffs were intended to benefit from her services.

Addressing the potential conflict of interest in the adjuster's performance of services for Allstate and the plaintiffs, none of the justices concluded that the potential conflict made it impossible for a duty to arise. The majority held that the adjuster owed both a duty to perform nonadversarial services to the standard of a practicing attorney and, to the extent a potential conflict existed, to disclose it. *See id.* at 310-11. The dissent took the position that the duty owed was to fully disclose her adversarial role to the plaintiffs and advise them to consult an attorney. *Id.* at 321-22.

*Other circumstances held by Washington courts to give rise to an agent's duty of care: intended beneficiaries*

Returning to *Centurion*'s guidance, after considering Washington cases dealing with the type of professional involved, the court next considered other circumstances that had led it to recognize a professional duty of care. 186 Wn.2d at 66. Relevant here, the

27

court observed that it has extended a professional duty of care to third parties "when the third party is an intended beneficiary." *Id.*

*Centurion* cites *Stewart Title Guaranty Co. v. Sterling Savings Bank*, 178 Wn.2d 561, 567, 311 P.3d 1 (2013) as an example of a case in which the court applied the principle that an intended beneficiary of an agent's promise to its principal is owed a duty by the agent. In *Stewart Title*, the plaintiff title insurer issued a policy to a bank in connection with a project financed by the bank. When a priority dispute arose that conflicted with the title insured, Stewart Title hired the bank's longtime law firm to represent the bank. The bank lost, and Stewart Title indemnified the bank against the loss. Contending that the law firm stipulated away a viable defense, Stewart Title sued the law firm for malpractice.

Where a nonclient third party asserts a professional negligence claim against a lawyer, Washington courts apply a six factor test, adopted in *Trask v. Butler*, 123 Wn.2d 835, 841, 872 P.2d 1080 (1994), to determine whether the lawyer may be liable. (The same test applied in the case of Allstate's adjuster in *Jones*, 146 Wn.2d 291.) The first factor, which is the primary inquiry and determines whether the court needs to consider the remaining five, is "[t]he extent to which the transaction was intended to benefit the plaintiff." *Stewart Title*, 178 Wn.2d at 565-66 (quoting *Trask*, 123 Wn.2d at 843). The lawyer's conduct must be intended to benefit the third party "to some extent." *Id.* at 570. Stewart Title's only evidence that the bank and its law firm intended to benefit Stewart

28

Title was that there was an alignment of interests between it and the bank on the issue of the bank's priority, and that the law firm agreed to keep Stewart Title informed about the litigation. Noting other respects in which the bank's and Stewart Title's interests diverged, the court held that the evidence was insufficient to establish that the bank and its law firm intended Stewart Title to benefit from the representation. *Id.*

Other authorities support finding a duty where a plaintiff is intended to benefit from the type of promise of performance that American Guarantee secured from York. *See* W. KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 93, at 670 (5th ed. 1984) (Stating, in addressing third party injury resulting where a promisor fails to perform its contractual undertaking, "It is time to dispense with the distinction between misfeasance and nonfeasance when foreseeable harm has resulted from reasonable reliance on a promisor to do what was promised."). Where economic harm results from a defendant's misfeasance or its nonfeasance plus reliance, the promisor may be liable on a tort theory not only to the promisee "but also to those who are intended beneficiaries of the promise." W. KEETON ET AL., *supra*, pocket part at 91.

The *Restatement (Third) of Agency* also identifies the intent to benefit a third party as a circumstance in which an agent's breach of duty to the principal may subject the agent to liability for the third party's loss. RESTATEMENT (THIRD) OF AGENCY § 7.02 cmt. d (AM. LAW INST. 2006). As the *Restatement* provision explains, it is not enough that the principal has instructed an agent to do an act that will benefit a third party; the

29

agent must have manifested to the principal—expressly or implicitly—that it intends to implement the principal's instruction. *Id.*

To reiterate, York promised American Guarantee that it would "[p]romptly and thoroughly review, process, Adjust, settle and pay Claims under the Policy;" that it would perform its duties "from the date of first report until final resolution," and that it would do so in compliance not only with its agreement and the policy, but "in full compliance with . . . all applicable legal and regulatory requirements." CP at 2491. It would have been impossible for York to both keep property owners in the dark about the policy's coverage for their property—which it did—and at the same time fulfill its contractual duties. A plain reading of the contract supports American Guarantee's position that property owners were expected to benefit from York's performance of its obligations under the third party administrator agreement.

York nonetheless points to a statement in the contractual definition of "Claims Administrative Services" that it argues absolves it of any duty to property owners: the definition disavowed a duty on York's part to "engage in the practice of law or assume the obligations of an insurer, with respect to the payment of Claims and [Allocated Loss Adjustment Expense]." CP at 2490. We are unpersuaded that the definition prevents any duty owed to insureds. American Guarantee had no duty under Washington law to provide insureds with legal advice, so York could take on a Washington insurer's duties without engaging in the practice of law. And the Merrimans have never contended that

30

York undertook American Guarantee's duty to "pay[ ] . . . Claims and [Allocated Loss Adjustment Expense]."

*Advancing Washington's policy of protecting insureds*

After examining precedent in *Centurion*, the court next considered whether providing a legal duty of care would advance or frustrate relevant insurance law. 186 Wn.2d at 65. York argues that a finding that it owed a duty of care would frustrate Washington law by causing it, as an adjuster, to "represent" both the insurer and insured in the same transaction. RCW 48.17.410 prohibits licensed adjusters from representing both parties as an adjuster in the same transaction.

The Merrimans have not persuaded us that an independent adjuster owes a general duty of care to an insured; what they do argue persuasively is that York had a duty to exercise reasonable care to fulfill the insurer's duties to insureds that it promised to fulfill in the third party administrator agreement. Specifically, the Merrimans argue that York owed a duty to exercise reasonable care to "fully disclose to first party claimants all pertinent benefits, coverages or other provisions of an insurance policy or insurance contract under which a claim is presented," as provided by WAC 284-30-350(1); to refrain from "[m]isrepresenting pertinent facts or insurance policy provisions," as provided by WAC 284-30-330(1); and to refrain from "[r]efusing to pay claims without conducting a reasonable investigation," as provided by WAC 284-30-330(4). Recognizing such a duty on York's part advances Washington insurance law.

31

Since the duty to comply with claims handling regulations could not require York to do anything that American Guarantee was not itself required to do, it cannot present a conflict between York and American Guarantee. York would not be representing insureds as an adjuster, so RCW 48.17.410 does not apply. Just as the regulations in chapter 284-30 WAC do not prevent American Guarantee from watching out for its own legal rights and interests in investigating, settling, and paying claims, they cannot prevent York from representing American Guarantee's interests as an independent adjuster.

When an insurer engages a claims administrator to take on all or substantial responsibility for claims investigation, adjustment, settlement and payment, it would be strange for it *not* to require the claims administrator to take responsibility for the associated claims handling regulations. Holding that a claims administrator owes a duty to insureds under these circumstances advances the policies of the insurance code by increasing the likelihood that the entity on whom everyone relies to comply with legal and regulatory requirements *will* comply. And since a Washington insurer's duties are nondelegable, it simplifies any resulting litigation. *See* DAN D. DOBBS, THE LAW OF TORTS § 321 at 873 n.17 (2000) (pointing out that a direct action by a plaintiff is "probably more desirable" than requiring the plaintiff to sue the party who has delegated a nondelegable duty and will have a claim over for indemnification). Finally, imposing a duty on the claims administrator safeguards against what might otherwise be an incentive for an unscrupulous insurer to engage an unscrupulous claims administrator who, by

32

No. 33929-7-III
*Merriman v. Am. Guar. & Liab. Ins. Co., et al.*

withholding information and cooperation, will prevent persons from ever discovering that insurance covers their loss.

Considering logic, common sense, justice, policy, and precedent, we hold that given the duties undertaken by York in the third party administrator agreement; the intent of that agreement to benefit, in part, American Guarantee's insureds; and the foreseeable harm to the insureds if York's relevant promises were not performed, York owed the insureds a duty of reasonable care to perform those promises.

### V. The Merrimans assert a viable non per se CPA claim, but their per se claims were properly dismissed

The CPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. It authorizes civil suits by any person "who is injured in his or her business or property" by a violation of the act. RCW 19.86.090. The legislature intends the CPA to "be liberally construed [so] that its beneficial purposes may be served." RCW 19.86.920. The CPA does not apply only to disputes between parties with a consumer relationship. *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 42, 204 P.3d 885 (2009).[11] Available remedies include

---

[11] York argues that a different and controlling result was reached in *International Ultimate, Inc. v. St. Paul Fire & Marine Insurance Co.*, 122 Wn. App. 736, 758, 87 P.3d 774 (2004), which held that "[t]o be liable under the CPA, there must be a contractual relationship between the parties." The *International Ultimate* court provided no authority for that statement; it conflicts with our Supreme Court's identification of the five elements of a CPA claim in *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986), and later cases; and it cannot survive

33

injunctive relief, damages, attorney fees and costs, and exemplary damages not to exceed trebled actual damages, capped at $25,000. RCW 19.86.090.

To prevail in a private CPA claim, the plaintiff must prove five elements: (1) an unfair or deceptive act or practice, which (2) occurs in trade or commerce, and (3) affects the public interest, for which (4) the plaintiff suffered injury to her business or property, and was (5) caused by the act in question. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986).

We turn first to the Merrimans' claims that York committed "per se" unfair and deceptive acts or practices by violating claims handling regulations. The first two elements required to prevail in a CPA action may be established by showing that the alleged act constitutes a per se unfair trade practice. *Id.* at 786. A per se unfair trade practice exists when a statute that has been declared by the legislature to constitute an unfair or deceptive act in trade or commerce has been violated. *Id.* A first party insured may bring an action for violation of the CPA based on a single violation of a claims-handling regulation. *St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 165 Wn.2d 122, 129, 196 P.3d 664 (2008), *aff'd*, 301 F. App'x 707 (9th Cir. 2008) (citing *Indus. Indem. Co. of the Nw., Inc. v. Kallevig*, 114 Wn.2d 907, 921, 792 P.2d 520 (1990)). The Merrimans' opening brief identifies several unfair or deceptive acts or practices identified by WAC 284-30-330 and -350 that they claim were violated by York. Br. of Appellant at 28.

the Supreme Court's holding in *Panag* that a CPA claim need not arise from a consensual business transaction or a business relationship. *Panag*, 166 Wn.2d at 38-39.

34

The problem for the Merrimans is that the per se deceptive practices on which they rely appear in regulations that apply only to insurers. *See* WAC 284-30-310 ("This regulation[12] applies to all *insurers* and to all insurance policies and insurance contracts"); and WAC 284-30-350(1) ("No *insurer* shall fail to fully disclose to first party claimants all pertinent benefits, coverages or other provisions of an insurance policy or insurance contract under which a claim is presented") (emphasis added). York did not violate the regulations unless it is an "insurer."

"Insurer" is defined in the regulation to mean "any individual, corporation, . . . [or] other legal entity engaged in the business of insurance, authorized or licensed to issue . . . any insurance policy or insurance contract in this state." WAC 284-30-320(8) (emphasis added). An adjuster is not licensed to issue an insurance policy or contract.[13]

The Merrimans nonetheless argue that York is "in the business of insurance," satisfying the first clause of the definition of an "insurer." But the definition is not framed in the disjunctive; both clauses of the definition modify the subject. The regulations do not apply to York, so the Merrimans' claims of per se violations of the CPA were properly dismissed.

---

[12] WAC 284-30-300 states that "this regulation" is "WAC 284-30-300 through 284-30-400."

[13] The insurance code includes its own, similar definition of "insurer" that likewise does not encompass adjusters: "'Insurer' as used in this code includes every person engaged in the business of *making contracts of insurance*." RCW 48.01.050 (emphasis added).

35

Absent a per se violation of the CPA, a plaintiff may undertake to prove to the jury that the defendant engaged in a practice that was nonetheless unfair or deceptive. To demonstrate a deceptive act, "[the] plaintiff need not show that the act in question was intended to deceive, but that the alleged act had the capacity to deceive a substantial portion of the public." *Hangman Ridge*, 105 Wn.2d at 785 (emphasis omitted). An unfair act is established by evidence that it (1) causes or is likely to cause substantial injury, which (2) consumers cannot avoid, and (3) is not "outweighed by countervailing benefits." *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 787, 295 P.3d 1179 (2013) (quoting 15 U.S.C. § 45(n)).

The Merrimans argue that a jury could conclude that York's failure to alert property owners to available coverage was an unfair or deceptive act that led to harm for purposes of the CPA when the owners were required to resort to other sources of payment for their loss, or in some cases go without complete indemnity as a result. We agree. The Merrimans have asserted a viable non per se CPA claim.

### VI. Given our reinstatement of two claims against York that were never decertified as class actions, the trial court should reassess its decertification of the negligent misrepresentation and non per se CPA claims

Finally, the Merrimans ask us to reverse the trial court's decision decertifying the class action against York. We review a trial court's order on class certification for abuse of discretion. *Lacey Nursing Ctr., Inc. v. Dep't of Revenue*, 128 Wn.2d 40, 47, 905 P.2d 338 (1995).

36

Here, the trial court never decertified the class as it relates to two of the claims that we reinstate: insurance bad faith and negligence. While it found that individual issues would predominate with respect to the negligent misrepresentation and non per se CPA violation claims, it appears from our record on appeal that acts and omissions are relatively likely to have been identical as to affected parties at York's level—more so than, say, at Partners' level.

Still, the trial court presided over extensive proceedings in this case involving four defendants, not just York, and unquestionably has a greater command than we do of the similarities or differences between class members' claims. We are satisfied that the trial court is in the best position to reexamine its decertification decision in the first instance. We remand with directions that the court reconsider its decertification decision in light of the claims that have been reinstated.

We reverse dismissal of the Merrimans' insurance bad faith, negligent misrepresentation, negligence, and non per se CPA claims and remand for proceedings consistent with this decision.

Siddoway, J.

I CONCUR:

Fearing, C.J.

33929-7-III

KORSMO, J. (dissenting in part) — The majority goes too far in creating new causes of action against the adjuster, York Risk Services Group, Inc. (York), under these facts and in unnecessarily conflicting with the decision in *International Ultimate, Inc. v. St. Paul Fire & Marine Insurance Co.*, 122 Wn. App. 736, 87 P.3d 774 (2004) (*IUI*). Since these plaintiffs often must choose between suing in tort and in contract under our independent duty doctrine, I do not think they can evade that stricture by suing the insurer in contract and the insurer's agent in tort over the same contractual duty. An action under our Consumer Protection Act (CPA), ch. 19.86 RCW, is an adequate remedy here for York's alleged misbehavior and would avoid blurring a line our court has long struggled to make clear.

The leading case is *Eastwood v. Horse Harbor Foundation*, 170 Wn.2d 380, 241 P.3d 1256 (2010). Recognizing that the question presented was how to determine when a plaintiff is limited to contract remedies and when tort remedies might be available, the court answered its own question:

> An injury is remediable in tort if it traces back to the breach of a tort duty *arising independently of the terms of the contract.* The court determines whether there is an independent tort duty of care . . . . When no independent tort duty exists, tort does not provide a remedy.

*Id.* at 389 (emphasis added).[1]

Here, as the majority nicely demonstrates, the only duty imposed on York arose from its contractual obligation to fulfill American Guarantee's obligations under the insurance policy. Absent that contract, there was no independent duty owed the plaintiffs by York. Accordingly, there is no basis for extending liability to the adjuster.

Similarly, Division One rejected the idea of independent tort liability for adjusters in *IUI*. 122 Wn. App. at 757-58. The court expressly recognized that any liability would have been based on contract. *Id.* The employees could not be sued separately from their employer. *Id.* at 758.[2]

---

[1] In *Eastwood*, the long recognized tort of waste was independently actionable despite the fact that the contract between the parties also required the defendant to maintain the property. 170 Wn.2d at 402 (lead opinion), 417-418 (Chambers, J., concurring).

[2] York's actions could certainly be held against American Guarantee and support an action against the insurer. However, the claims between the plaintiffs and American Guarantee have been settled. Although all participants to an insurance claim have a duty to act in good faith, RCW 48.01.030, I do not think that statute creates a basis for relief against the adjuster where, as here, there is no other relationship between the plaintiffs and the adjuster except through the adjuster's status as the insurance company's agent. York acted as American Guarantee's agent and any liability should belong to the principal, not the agent.

No. 33929-7-III
*Merriman v. Am. Guar. & Liab. Ins. Co., et al.*

While that explains the basis for my disagreement here, I do agree with the majority that the CPA analysis in *IUI* has been superseded by subsequent case law. For that reason, I would permit a CPA claim independent of the contract to proceed.

I respectfully dissent.

_____
Korsmo, J.

3