[No. 40079-7-I.   Division One.   February 16, 1999.]

FIRST STATE INSURANCE COMPANY, *Appellant*, v. KEMPER NATIONAL INSURANCE COMPANY, d/b/a LUMBERMAN'S MUTUAL CASUALTY COMPANY,[†] *Respondent.*

---

[†]The correct spelling is Lumbermens Mutual Casualty Company.

604

*Linda B. Clapham* and *Jeffrey D. Laveson* of *Lane Powell Spears Lubersky, L.L.P.,* for appellant.

*Palmer Robinson* of *Carney Badley Smith & Spellman* (*Bruce D. Celebrezze* of *Celebrezze & Wesley,* of counsel), for respondent.

AGID, A.C.J. — Lance Powell was electrocuted on property owned by Great Western Lumber Company (Great Western). Lumbermens Mutual Casualty Company (Lumbermens) was Great Western's primary insurer, and First State Insurance Company (First State) provided Great

Western's excess liability coverage. After a jury awarded Powell's family $2 million, Lumbermens tendered its policy limits to First State for payment. Believing that Lumbermens had badly mishandled the claim, First State sued alleging bad faith, negligence, misrepresentation, and a violation of the Consumer Protection Act (CPA). The trial court dismissed all of the claims except bad faith, ruling that the negligence and bad faith claims were the same cause of action and First State lacked standing to raise a CPA claim. The jury found Lumbermens' conduct did not rise to the level of bad faith and returned a defense verdict. The trial court denied First State's motion for judgment notwithstanding the verdict or in the alternative a new trial.

On appeal we hold that negligence and bad faith are different causes of action and that an equitable subrogee standing in the shoes of the insured may bring a CPA claim against the primary insurer. We also conclude that the trial court erred in admitting evidence against First State related to affirmative defenses and counterclaims Lumbermens had not pleaded. We therefore reverse and remand for a new trial.

## FACTS

Lance Powell was electrocuted while operating conveyors transferring sawdust from a storage bunker on Great Western's premises to a delivery truck owned by his employer, Barleans, Inc. Both Barleans and Great Western inspected and made repairs to the electrical system. Because Barleans was Powell's employer, his survivors' remedy was limited to the exclusive remedies permitted by the workers' compensation law, even though Barleans' negligence for improper installation and maintenance of the switches on the conveyor system was uncontested.

In August 1989, Powell's survivors (the Powells) filed a wrongful death lawsuit against Great Western and Barleans. Great Western tendered defense of the claim to its primary insurer, Lumbermens, who hired defense counsel

to represent Great Western. The Lumbermens' policy had a limit of $1 million per occurrence. Great Western had also purchased $5 million excess coverage from First State, and it notified First State of the lawsuit the following day.

Approximately six months later, First State's assistant manager for excess casualty claims wrote to Lumbermens inquiring about the litigation, including defense counsel's opinion of settlement potential. When Lumbermens replied a month later, it told First State that, contrary to the facts, the incident did not occur on Great Western's property, Great Western was not involved, and this was an excellent case for summary judgment. Lumbermens promised to advise First State once summary judgment was granted. A few days later, counsel for Great Western told the Lumbermens adjuster who had replied to First State's inquiry that Great Western's potential liability was significant. Lumbermens did not pass this information along to First State.

Six months later, First State again wrote Lumbermens asking why it had heard nothing further and requesting information on the status of the case and the summary judgment motion. A different Lumbermens' adjuster wrote First State that the motion would be heard within two weeks and that Lumbermens would immediately advise First State of the outcome.

Before the court heard Great Western's first motion for summary judgment, its attorney told Lumbermens that there had been no discussion of settlement and, if it lost the summary judgment motion, it would have to address the potential for a large damage award. The motion was denied. Counsel reported the ruling to Lumbermens and told it that Barleans had been dismissed under the exclusive remedy provisions of the workers' compensation statute.

Four and a half months later, Great Western's attorney warned Lumbermens of Great Western's potential liability because Lance Powell was a young man with a young family. However, he also believed that most of the Powells' theories would not be allowed to go to the jury.

In mid-January 1992, the Powells' attorney wrote Great Western's counsel demanding $1 million to settle her clients' claims against Great Western. The offer remained open for one month, but counsel did not communicate it to Lumbermens until four days before it expired. The day before the Powell settlement offer was to expire, First State again wrote to Lumbermens asking to be told the promised results of the summary judgment motion and the status of the claim.

Five days later, the court granted the Powells' motion for summary judgment on the question of Great Western's liability. At the trial, which was scheduled to begin two weeks later, the only remaining issues were the amount of damages and whether Lance Powell was contributorily negligent.

Five days *after* the Powell settlement offer expired, Lumbermens notified Great Western of the offer. Ten days after the offer expired, Lumbermens finally delivered the bad news to First State: the defense motion for summary judgment was unsuccessful, the estate had established Great Western's liability, and there had been a $1 million settlement offer from the Powells which was withdrawn before the estate's successful summary judgment motion.

The Powells' attorney then set up a meeting with counsel for Great Western and a Lumbermens' representative to discuss settlement. Lumbermens cancelled the meeting because of scheduling conflicts with economic experts in the case. The Lumbermens' representative was attempting to get an evaluation of the case and authority to settle the claim, possibly as a structured settlement. Lumbermens did not attempt to reschedule and made no offer to settle. Four days before trial, another adjuster at Lumbermens evaluated Great Western's liability exposure at between $950,000 to $1,500,000 unless the jury found Lance Powell was contributorily negligent. The adjuster suggested a settlement value of $600,000, but Lumbermens still did not make an offer.

Up to this time, no one had told the Powells about the

excess coverage. When Lumbermens informed counsel for the Powells that there was excess coverage, it asked whether that would change the Powells' willingness to settle for $1 million. Powells' counsel asked Lumbermens to make a $1 million offer so she could present it to her clients, but Lumbermens refused. About this time, First State wrote and demanded that Lumbermens offer the Powells its $1 million policy limits to settle the lawsuit. Lumbermens again refused.

At the beginning of trial, the court granted Great Western's motion for reconsideration and allowed the jury to decide the question of liability. The next day Lumbermens made a $100,000 settlement offer and notified First State that, in its opinion, the case was not worth $1 million. Four days later, the jury returned a verdict in favor of the Powells for $2 million.

First State again asked Lumbermens to offer the Powells $1 million to settle. Lumbermens again refused. Lumbermens filed an appeal even though an attorney it hired to observe the trial advised it that the chances of reversal were not good. Lumbermens then tendered $1 million, plus interest from the judgment date, to First State and notified it that Lumbermens would no longer be a party to the appeal. First State accepted the tender under a full reservation of rights against Lumbermens. A few months later First State settled the case with the Powells for $1.5 million. First State then filed this lawsuit. The underlying basis for all of its claims is Lumbermens' failure to conduct any meaningful settlement negotiations with the Powells.

## DISCUSSION

### 1. CPA Claim.

■ ■ To establish a claim under the CPA, First State must prove five elements: (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) public interest impact, (4) injury to First State's business or prop-

erty, and (5) causation.[1] Whether a particular action gives rise to a CPA violation is a question of law.[2] We are to construe the CPA liberally to serve its purpose of protecting the public and fostering fair and honest competition. RCW 19.86.920.

RCW 48.30.010(2) prohibits insurance businesses from engaging in unfair or deceptive acts or practices as defined in regulations promulgated by the insurance commissioner. WAC 284-30-330 specifically applies to settling insurance claims and defines several unfair acts or practices. Committing any of these acts or practices is an unfair trade practice per se.[3] First State argues that, as an excess insurer which is equitably subrogated to the rights of its insured, it may assert a CPA claim which the insured could have brought against the primary insurer. The trial court held that it may not. We agree with First State.

An excess insurer is subrogated to the rights an insured has to recover on claims the insured has against the primary insurer.[4] While the Supreme Court has not decided the precise issue presented here—whether an excess insurer may bring a CPA claim—we recently discussed the application of the equitable subrogation rule to CPA claims in *State Farm Fire & Casualty Co. v. Huynh.*[5] There, State Farm filed fraud and CPA claims against a doctor to recover financial losses it suffered from false injury reports and billings he submitted to State Farm on behalf of State Farm's insureds who had staged an auto accident. Like

---

[1]*Industrial Indem. Co. of the N.W., Inc. v. Kallevig*, 114 Wn.2d 907, 920-21, 792 P.2d 520 (1990); *Estate of Hall v. HAPO Credit Union*, 73 Wn. App. 359, 365, 869 P.2d 116 (1994). *See also Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986).

[2]*Dombrosky v. Farmers Ins. Co.*, 84 Wn. App. 245, 260, 928 P.2d 1127 (1996); *Estate of Hall*, 73 Wn. App. at 365 (citing *Keyes v. Bollinger*, 31 Wn. App. 286, 289, 640 P.2d 1077 (1982)).

[3]*Kallevig*, 114 Wn.2d at 923.

[4]*Millers Cas. Ins. Co. v. Briggs*, 100 Wn.2d 9, 14, 665 P.2d 887 (1983); *Truck Ins. Exch. of Farmers Ins. Group v. Century Indem. Co.*, 76 Wn. App. 527, 531, 887 P.2d 455 (1995).

[5]*State Farm Fire & Cas. Co. v. Huynh*, 92 Wn. App. 454, 962 P.2d 854 (1998).

Lumbermens, the doctor argued that State Farm did not have standing to sue him because the CPA was designed to protect consumers, not insurance companies. We disagreed, holding that an injured party need not be a consumer of goods or services to assert a cause of action under the CPA.[6] We agree with the *Huynh* court that an insurance company is a logical party to act as a private attorney general because it stands in the shoes of its premium-paying consumers who are affected by the underlying improper actions. Thus, allowing it to bring a CPA action furthers the purposes of the Act.

We also continue to adhere to our opinion in *Escalante v. Sentry Insurance Co.*[7] where we specifically declined to follow two Division Two cases holding that a consumer relationship was a prerequisite to standing to maintain a cause of action under the CPA. Because the insurance company is standing in the shoes of the insured consumer, it logically follows that it may pursue the rights of its insured.[8] Had Great Western not had excess coverage, it would have been personally liable to the Powells for any judgment over Lumbermens' $1 million policy limits, and many of the negligent acts about which First State complains occurred without regard to the existence of excess coverage.

A majority of cases from other jurisdictions hold as we do that, under the doctrine of equitable subrogation, the duty a primary insurer owes an excess insurer is identical to

---

[6]*Huynh*, 92 Wn. App. at 459 (citing *Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 313, 858 P.2d 1054 (1993)). *But see Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 394, 715 P.2d 1133 (1986) (holding that only the insured has standing to bring per se CPA actions for breach of an insurer's duty of good faith). We distinguish *Tank* because First State's claims are not limited to bad faith, and it is subrogated to Lumbermens' insured's claims as if Great Western itself were filing suit against Lumbermens.

[7]*Escalante v. Sentry Ins. Co.*, 49 Wn. App. 375, 386, 743 P.2d 832 (1987).

[8]We also note that an insured's bad faith cause of action against an insurer can be assigned to a third party claimant after judgment or settlement of the main case. *See Safeco Ins. Co. v. Butler*, 118 Wn.2d 383, 823 P.2d 499 (1992).

that owed the insured.[9] In *Valentine v. Aetna Insurance Co.*, the court quoted the succinct reasoning of the Minnesota Supreme Court:

> When there is no excess insurer, the insured becomes his own excess insurer, and his single primary insurer owes him a duty of good faith in protecting him from an excess judgment and personal liability. *If the insured purchases excess coverage, he in effect substitutes an excess insurer for himself. It follows that the excess insurer should assume the rights as well as the obligations of the insured in that position.*[10]

We also agree with the Minnesota court's observation that "when a primary insurer breaches its good faith duty to settle within policy limits, it imperils the public and judicial interests in fair and reasonable settlement of lawsuits."[11] As that court pointed out, a contrary result permits an unfair distribution of losses among insurers. We agree with the logic and policy expressed in these cases and hold that the trial court erred in dismissing First State's CPA claim as a matter of law.

Lumbermens argues that dismissing the CPA claim, if error, was harmless. Part of the trial court's reasoning in dismissing the CPA claim was that it did not seem fair to allow both bad faith and CPA claims to go forward on the same facts. But the Supreme Court recently held to the contrary in *Coventry Associates v. American States Insurance Co.*,[12] holding that bad faith and CPA claims were separate causes of action.[13] If Lumbermens failed in its duty to First State and those failures are sufficient to satisfy the elements of a CPA claim, First State is entitled to recover.

---

[9]*See generally, Valentine v. Aetna Ins. Co.*, 564 F.2d 292, 297-98 (9th Cir. 1977).

[10]*Valentine v. Aetna Ins. Co.*, 564 F.2d 292, 297 (9th Cir. 1977) (quoting *Continental Cas. Co. v. Reserve Ins. Co.*, 307 Minn. 5, 238 N.W.2d 862, 864 (1976) (emphasis added)).

[11]*Continental Cas. Co.*, 238 N.W.2d at 864-65 (footnote omitted).

[12]*Coventry Assocs. v. American States Ins. Co.*, 136 Wn.2d 269, 961 P.2d 933 (1998).

[13]*Coventry Assocs.*, 136 Wn.2d at 279.

If its actions did not constitute a violation of the act, it is under no greater disability because both claims arise from the same facts. As the equitable subrogee to Great Western's rights, First State may proceed with its claim that Lumbermens' failure to settle with the Powells violated the CPA.

## 2. Bad Faith and Negligence Claims.

■ In its complaint, First State pleaded both negligence and bad faith against Lumbermens. Without actually saying it was dismissing the negligence claim, the trial court refused to give any of First State's proposed negligence instructions. It did give one instruction defining proximate cause, but this was clearly insufficient to allow the jury to decide First State's negligence claim. Its negligence theory was supported by substantial evidence and should have been submitted to the jury.[14]

■ ■ First State was entitled to instructions on negligence as well as bad faith because they are two separate and distinct causes of action. It is well established that an insurance company undertaking to defend its insured may be liable to the insured for failing to make a good faith attempt to settle once its insured's liability is established if that failure is attributable to *either* bad faith or negligence.[15] Where courts have adopted standards of good/bad faith and ordinary care, as we have in Washington, the plaintiff is entitled to a jury verdict on theories of either negligence or bad faith, *independent of each other*[16] because a party may fail to use ordinary care yet still not act in bad faith. As the cases and the proposed instructions in this case demonstrate, each claim presents a different legal theory with different elements. It is for the trier of fact to resolve the is-

---

[14]*Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 263, 840 P.2d 860 (1992).

[15]*Tank v. State Farm Fire & Cas. Co.*, 38 Wn. App. 438, 442, 686 P.2d 1127 (1984), *aff'd in part, rev'd in part on other grounds*, 105 Wn.2d 381, 715 P.2d 1133 (1986); *see also Tyler v. Grange Ins. Ass'n*, 3 Wn. App. 167, 176, 473 P.2d 193 (1970).

[16]*Tyler*, 3 Wn. App. at 175 (citing *Ballard v. Ocean Accident & Guar. Co.*, 86 F.2d 449 (7th Cir. 1936)).

sue of whether the insurer acted in bad faith and breached the duty of ordinary care.[17] The trial court's instructions precluded the jury from considering First State's negligence claim. We must therefore reverse and remand the issue for trial.

3. Evidence of First State's Handling of the Powell Claim.

Lumbermens pleaded two affirmative defenses in this case: (1) failure to state a claim, and (2) insufficient service of process. About a month before trial, in response to First State's motion for summary judgment, Lumbermens suggested it would assert as defenses First State's failure to mitigate and its own "bad faith" during the period before the claim was settled. Lumbermens argued that First State's conduct was relevant to Lumbermens' liability and/or damages. First State responded with a motion to preclude any evidence or argument about these "affirmative defenses" because they were not timely pleaded. It also moved in limine to preclude testimony or argument about First State's conduct during the period Lumbermens was adjusting the claim.

The trial court ruled that evidence of First State's conduct was relevant and admissible as a defense to First State's claim, but not as an affirmative defense, and ordered Lumbermens not to argue that First State acted in bad faith by issuing a reservation of rights letter. But the trial court allowed Lumbermens to argue about the letter as it related to damages. It also granted First State's motion in limine prohibiting Lumbermens from arguing that the conduct of First State's counsel was improper. The pretrial rulings generally permitted Lumbermens to introduce all its proposed evidence but prohibited it from characterizing that evidence directly as bad faith.

At trial, Lumbermens portrayed First State as having failed to properly defend the underlying claim against Great Western and acting improperly by not offering to contrib-

---

[17]*Tank*, 38 Wn. App. at 444.

ute to settlement of the wrongful death claim. After the
jury heard about First State's conduct, Lumbermens moved
for a directed verdict, arguing that First State's equities
were not superior to Lumbermens and the case should be
dismissed. The trial court denied the motion, ruling that
because there was no bad faith counterclaim raised in Lum-
bermens' pleadings, it was waived. Lumbermens continued
to argue that First State acted in bad faith by failing to
defend or contribute to settlement, focusing on its "omis-
sions" in closing argument to the jury. First State assigns
error to the admission of testimony about its actions in
dealing with the Powell claim. We agree with First State
that most of this evidence was not relevant to any issue at
trial, primarily because Lumbermens failed to plead the af-
firmative defenses to which the testimony relates.[18]

Affirmative defenses are waived unless they are
timely pleaded, asserted in a CR 12(b) motion, or tried by
the express or implied consent of the parties.[19] Here, the
trial court deferred ruling on the majority of First State's
motions to exclude specific evidence pertaining to its
conduct until after the evidence came in, stating that it
would have to "wait and do that on a question-by-question
basis." Although it had ruled that Lumbermens waived the
affirmative defenses of contributory negligence, failure to
mitigate, or unclean hands/bad faith, and none of the evi-
dence before the jury could be used to support those claims,
the court allowed Lumbermens to use the same evidence to
argue about the interaction between the companies and
damages. In this, the trial court erred. The only damage is-
sue was whether First State, as the excess insurer standing
in for the insured, proved that it sustained damages from

---

[18]Relevant evidence is "evidence having any tendency to make the existence
of any fact that is of consequence to the determination of the action more prob-
able or less probable than it would be without the evidence." ER 401. Trial court
rulings on the admissibility of evidence are reviewed under an abuse of discretion
standard. A trial court abuses its discretion when its decision is manifestly unrea-
sonable or based upon untenable grounds.

[19]*See Bernsen v. Big Bend Elec. Coop., Inc.*, 68 Wn. App. 427, 434, 842 P.2d
1047 (1993).

Lumbermens' negligence, bad faith, or CPA violation. Because there was no mitigation of damages issue in the case, First State's conduct was irrelevant. Similarly, there was no issue at trial about First State's actions toward Lumbermens because Lumbermens had not pleaded either bad faith or failure to mitigate as affirmative defenses. In addition, any evidence of First State's conduct was irrelevant because Lumbermens had always told First State the claim was not worth the $1 million Lumbermens' policy would cover.

Not only was the evidence irrelevant to any claim before the jury, it was also highly prejudicial. The transcript reveals that this testimony changed the focus of the trial from Lumbermens' inaction in settling the claim to whether First State failed to act. This was particularly misleading because the uncontroverted evidence was that Lumbermens continually assured First State that it needn't worry about liability, that the underlying claim was not worth $1 million, and then refused to offer its $1 million in settlement when both the Powells and First State asked it to do so. The trial court abused its discretion by admitting the evidence. Because it is highly likely that this error affected the jury's verdict on First State's bad faith claim, we reverse and remand for a new trial on First State's bad faith, negligence, and CPA claims.[20] Reversed and remanded.

BECKER and COX, JJ., concur.

Review denied at 138 Wn.2d 1009 (1999).

---

[20]We need not discuss First State's argument that the trial court erred in denying its motion for judgment notwithstanding the verdict because we are remanding for a new trial on all issues. We also deny Lumbermens' motion to strike a portion of First State's brief.