IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| LISA MARIE RYBACKI, | No. 84676-1-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| PROGRESSIVE CASUALTY INSURANCE COMPANY, a foreign insurance company; RANDALL HIATT as Personal Representative for THE ESTATE OF LILLIAN MAUDE HIATT, | |
| Respondents. | |

CHUNG, J. — After she was rear-ended, Lisa Rybacki sued Lillian Hiatt, the driver of the car that hit her, for negligence. Her lawsuit also included several contractual and extra-contractual claims against her own underinsured motorist (UIM) insurer, Progressive Casualty Insurance Company. The jury returned a verdict of $1.8 million against Hiatt's Estate.[1] Progressive requested and received a directed verdict on all claims against it. The court entered judgment against Progressive for $250,000, which was the limit of Rybacki's UIM policy, and against Hiatt's Estate for the remainder of the $1.8 million verdict.

We conclude that, construing the facts and reasonable inferences in Rybacki's favor, there was substantial evidence to support all of Rybacki's claims

---

[1] Hiatt died during the pendency of the litigation, and her Estate was substituted as the defendant.

against Progressive; therefore, the court erred in granting a directed verdict on those claims. Additionally, with regard to the negligence claim against the other driver, the trial court erroneously entered the judgment on the verdict against both Hiatt's Estate and Progressive as judgment debtors, rather than solely against the Estate.

We reverse and remand for new proceedings on Rybacki's claims against Progressive. We also vacate the judgment order and remand for correction to the proper judgment debtor.

## FACTS

Lillian Hiatt rear-ended Lisa Rybacki's stopped car on June 2, 2018.[2] Rybacki suffered injuries to her head and neck. Rybacki promptly reported the accident to Progressive, her insurer. Progressive soon began issuing Personal Insurance Protection (PIP) benefits to Rybacki to pay for medical bills, eventually paying the full $10,000 limit of that policy.

In May 2019, through an attorney, Rybacki requested that Progressive open a claim under her UIM policy. By October 2019, Progressive had determined Hiatt's coverage was limited to $100,000.[3] Progressive set reserves for Rybacki's UIM claim at $100,000 and assigned the claim to a "large loss adjuster."

---

[2] The accident involved three vehicles. Hiatt rear-ended Rybacki and pushed her car into the trailer in front of her that belonged to Bryce Bradford.

[3] Hiatt had $100,000 in insurance coverage through State Farm Mutual Automobile Insurance Company, which accepted 100 percent fault for the collision.

In February 2020, Rybacki[4] sent medical records to Progressive with a letter from her attorney explaining that she had major injuries, including traumatic brain injury, headaches, and neck and shoulder pain, all of which had significant impact on her life and were expected to be permanent. The letter asserted that Rybacki's injuries and damages would likely exceed Hiatt's policy limits of $100,000, and confirmed Rybacki's $250,000 in UIM coverage. The letter also reminded Progressive that it "has a duty to investigate and promptly pay any coverage Ms. Rybacki is entitled to as soon as it is clear that Ms. Rybacki's injuries and damages exceed the third-party policy limits."

In March 2020, Progressive evaluated Rybacki's UIM claim. Without explanation, the evaluation concluded her cervical neck injury lasted nine months and her headaches lasted twelve months. At that time, Progressive made no offer to Rybacki of UIM benefits.

At Progressive's request, Rybacki supplied additional medical records in April 2020. Rybacki reiterated that her headaches, fatigue, memory loss, and neck pain had been ongoing since the accident almost two years before. The correspondence requested that Progressive "please explain in writing the facts and circumstances surrounding your investigation into Ms. Rybacki's harms and losses, including what injuries you believe she has suffered as a result of the collision, as well as how you calculated the value of Ms. Rybacki's harms and losses." Rybacki also offered to discuss any of the documentation or provide additional information if needed.

---

[4] All of Rybacki's communications with Progressive occurred through her counsel.

Progressive conducted a second evaluation of Rybacki's claim in May 2020. The evaluation noted neurology treatment consisting of botulinum toxin type A (Botox) injections for cervical dystonia between August 2019 and December 2019, and again in March 2020. Despite the new evidence, Progressive continued to evaluate Rybacki's cervical spine injury as lasting nine months and headaches as lasting twelve months. Progressive made a compromise settlement offer of $5,000 plus attorney fees and waiver of PIP subrogation, without explanation of how it arrived at this figure.

Rybacki requested explanation of Progressive's investigation and calculation of the settlement offer. Progressive explained that the offer arose from consideration of the medical expenses and general damages and noted that Rybacki had pre-existing headaches, neck, and back injuries at the time of the accident. Rybacki inquired as to whether Progressive had considered her non-economic damages, which she was legally entitled to recover. In response, without directly answering Rybacki's question, Progressive increased its settlement offer to $10,000.

Rybacki answered with a request for information on Progressive's investigation of her injuries and reiterated their permanent and progressive nature. Upon receipt of the letter, Progressive conducted a third evaluation in November 2020. The assessment of Rybacki's headaches and cervical neck injuries remained the same. Progressive offered an additional $4,575 based on billings for acupuncture treatment, bringing the total settlement offer to $14,575.

Soon after, Rybacki submitted an Insurance Fair Conduct Act (IFCA) complaint to the Washington State Office of the Insurance Commissioner. In December 2020, Progressive offered a settlement of $20,000.

In late December 2020, Rybacki initiated a lawsuit against Hiatt and Progressive. She alleged that Hiatt's negligent driving caused her injuries, including medical expenses, physical injuries, pain and suffering, and mental and emotional distress. Against Progressive, Rybacki brought several claims related to her UIM coverage—breach of contract, violations of the Consumer Protection Act (CPA) and IFCA, and negligent and bad faith investigation and adjustment of the claims.

Rybacki requested bifurcation of the trial proceedings. The first phase would determine the damages suffered as a result of Hiatt's negligence, and the second phase would consider Rybacki's claims against Progressive. The court granted Rybacki's request to bifurcate and to seat one jury for both phases.[5] The trial court also granted Rybacki's motion for partial summary judgment as to Hiatt's liability, finding Hiatt 100 percent liable and the sole proximate cause of the collision. The court also dismissed Hiatt's affirmative defenses of offset and setoff, which Hiatt had waived in her summary judgment response.

Phase I of the trial addressed the nature and extent of Rybacki's damages due to Hiatt's negligence. Neurologist Dr. Clark testified about his treatment of Rybacki, whom he first saw in October 2018 for complaints of headache, cognitive and balance issues, and some numbness and tingling in her arms after

---

[5] Progressive agreed with the request to seat a single jury for both phases of the trial.

the car accident. He treated her for occipital nerve-related headaches, called occipital neuralgia, until he moved out of state in March 2021. He also diagnosed Rybacki with cervical dystonia,[6] which is a permanent condition. Dr. Clark treated her with Botox injections every ten to twelve weeks from September 2019 until March 2021. Rybacki's expert, Dr. Singh, reviewed Dr. Clark's records and opined that her headaches were most likely coming from the left C2-3 facet joint, where the occipital nerve originates. He testified that in his opinion, the occipital nerve was the primary area of injury and the C2-3 facet joint injury caused by the occipital neuralgia was permanent and was caused by the crash.

After hearing the medical and expert testimony and testimony from Rybacki, her family, and her friends, the jury returned a verdict of $1.8 million in noneconomic damages. The parties then moved on to Phase II of the trial.

Phase II addressed Rybacki's claims against Progressive and consisted of testimony from insurance expert Robert Dietz and Rybacki. Dietz testified that to prepare for his testimony, he reviewed the insurance claim file, "a chunk of the medical records and bills," Rybacki's deposition, the deposition of Progressive's corporate spokesperson, as well as Progressive's procedures and training manual, and a report by Progressive's "insurance person."

According to Dietz's testimony, Progressive has "an internal guideline that puts a cap or a limitation on the time period of which to evaluate nonsurgical injuries to not exceed 12 months. And I believe for brain injuries or neurological deficits up to 12 months, and then it comes to a stop." As an example, Dietz

---

[6] According to Dr. Singh, " 'cervical dystonia' is a painful persistent contraction of a muscle in the neck."

6

noted that Progressive's evaluations in March and May 2020—more than 18 months after the June 2018 accident—both assessed Rybacki's headaches as lasting twelve months and cervical injury as nine months. A few months later, the claim file still assessed headaches at 12 months and noted ongoing Botox injections for headaches. Dietz called these evaluations a "frozen assessment"— that is, one that does not change even with new information and evidence.

Dietz also testified that Progressive does not evaluate future noneconomic damages but instead assesses all damages at twelve months and under. According to Dietz, the Progressive corporate representative explained in his deposition that the company "didn't want to accept any of the permanencies." Dietz summarized the representative's deposition testimony explaining this approach to damages assessment: "if you evaluate a possible lifetime injury, that could be astronomical and insurance would not be affordable, so it was a policy of reduction before anyone knew it." And Dietz confirmed that the claim file reflects that Progressive did not assess any future non-economic damages. When asked whether using this type of frozen assessment to conclude that no economic damages were owed was "a fair thing to do," Dietz responded, "Not in reasonable industry standards . . . because that means that you buried your head in the sand and you're not being fair."

Dietz criticized Progressive's communications with Rybacki. He noted the settlement offers have only numbers and no explanation for what was considered to arrive at the offer. The correspondence provided no information so that Rybacki could understand how Progressive arrived at its offer numbers. Dietz

explained that "it's just a number. There is no basis or transparency or thought process." Additionally, Dietz testified that "[i]ndustry custom is to explain so that the insured knows, understands, can make an informed decision, but also on the other side, why this communication is so important, what if Progressive accidentally didn't read a record or see something miscalculated?"

Dietz testified that Progressive set reserves for the claim at $100,000. He explained "when a reserve is set inside a company, universally, the reserve is expected to be what at the time a reserve is made or changed up and down, what the ultimate outcome of the claim could be." Dietz noted that insurance companies face serious consequences for miscalculating reserves. He expressed confusion that Progressive's highest offer was $20,000, given the reserves and assignment to the large loss adjuster.[7] "Why is it reserved at 100,000 and given to the large loss adjuster if it didn't have that exposure?" "They reserved it at 100 and then assigned it to their large loss person, so that—they're looking at that kind of exposure."

When asked if Progressive denied coverage, Dietz replied, "[e]xplicitly, no. Constructively, I would say by not paying amounts known to be owed, that's constructively a denial of paying benefits." Dietz also testified that Progressive's actions did not meet industry custom due to the lack of consideration of noneconomic damages, the cutoff period for duration of headaches at twelve months, and the lack of explanation for the settlement offer figures.

---

[7] Dietz testified to his experience with another insurance company, where as a claims adjuster in the "Large Loss" division, he "was entrusted to handle the company's money at a very high level."

After Dietz's testimony, Rybacki testified about the impact of the accident on her life. From 1995 to 2003, Rybacki was a single mother with significant debt and bills and a suboptimal credit rating following her divorce. After meeting her second husband, Rybacki was able to pay off her past debt and, over 10 or 12 years, improve her credit score substantially. After the accident, her financial situation deteriorated. "The collision, the bills, and everything couldn't hit at a worse time, because right prior to COVID hitting, my husband's business kind of went on a downward spiral." Her husband and his business partner "went their separate ways" and they experienced some financial disruption as a result. When the COVID-19 pandemic began, they experienced a fairly significant impact on their financial life, but her husband "was able to pick everything up within like three months after."

By 2020, Rybacki was receiving three to four phone calls a week from collection agencies and the Everett Clinic, her physical therapy provider. She had made monthly payments, but eventually "got to the point where [she] couldn't make the monthly payments, so it was the constant—there was just a constant financial stress going on there, and the constant phone calls." At the time of trial, Rybacki had 24 different bills in collections, amounting to almost $19,000. She knew the interest was increasing on the debts but did not have the funds to pay. Rybacki unplugged her home phone and turned off the volume on her cell phone to avoid the stressful calls. She testified that she was not a good parent during that time due to "dealing with the stressors of everybody wanting money." She

felt "robbed" of her time with her children. Despite this testimony about her outstanding bills, Rybacki did not introduce any collection notices as exhibits.

In April 2021, the Everett Clinic, where she had been a patient for 27 years, turned her away due to outstanding bills. She could no longer see her doctor and has not had regular care from a doctor since then. Rybacki stated that if she had gotten her benefits from Progressive in 2020, she could have avoided all the financial stressors, the collection calls and outstanding bills, and she would have been able to get chiropractic and other care she could not afford.

After Rybacki's testimony, Progressive moved for a directed verdict on all contractual and extra-contractual claims against it. The trial court relied only on the evidence presented in Phase II and granted the motion. The trial court also entered judgment on the jury verdict of $1.8 million against judgment debtors Progressive and Hiatt's Estate. The judgment further ordered that "Defendant Progressive Casualty Insurance's obligation to pay is limited to $250,000 pursuant to the underinsured motorist policy and that Defendant Hiatt's obligation is to pay the remaining $1,550,000.00 and no more."[8] Rybacki appeals.

DISCUSSION

I.    Directed Verdict on Claims Against Progressive

Rybacki challenges the order granting a directed verdict for Progressive on her claims of bad faith, negligence, violations of the CPA and IFCA, and breach of contract. As an initial matter, Rybacki claims the trial court erred by

---

[8] Progressive and Hiatt's estate subsequently satisfied the judgment in the ordered amounts.

failing to consider evidence from Phase I of the trial in ruling on the motion for directed verdict on the Phase II claims.

In arriving at its decision on the directed verdict, the trial court explicitly declined to consider the Phase I testimony of one of the doctors. The trial court told the parties, it had "a pretty strong inclination" to prohibit the jury from discussing the deliberation or reasoning from Phase I during deliberation on Phase II. The court reasoned, "[I]t's understood that once the jury returned the verdict in phase one, that becomes law of the case. The Court thinks it's improper to allow any potential disturbance or re-litigation of the law of the case by the former alternate jurors."

This decision not to consider the Phase I evidence is contrary to the court's previous order granting a bifurcated trial with one jury. In Rybacki's motion for bifurcation, in addition to evidentiary concerns that could be addressed by separate phases, she noted that bifurcation would promote efficiency and judicial economy: "The jury and the judge in the insurance litigation will already be familiar with the case and the facts having just heard and decided the damages in the negligence trial," so having the same jury for the insurance trial would be "much shorter and efficient than having to explain to a new jury everything that happened at the negligence trial." Similarly, Progressive supported a single jury because seating one jury would "negate[ ] the need to re-call and re-examine phase one witnesses in phase two of the trial." Specifically, Progressive noted, "in order to determine the allegations in phase two, jurors will need to hear testimony from medical experts called in phase one."

11

Further, in seeking a directed verdict, Progressive did not contest consideration of Phase I evidence.[9] Based on the parties' arguments both on bifurcation and on the motion for directed verdict, it appears that, as Rybacki argues, the parties' understanding was that Phase I evidence would be considered during Phase II. Accordingly, absent any request to deviate from this understanding, the trial court should have considered the Phase I evidence in deciding the motion for directed verdict. Declining to do so was error.

Next, taking into consideration both the Phase I and Phase II evidence, we review the order granting a directed verdict on the Phase II claims against Progressive. A court may grant a motion for judgment as a matter of law, also known as a directed verdict, when "there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party with respect to that issue" and the claim "cannot under the controlling law be maintained without a favorable finding on that issue." CR 50(a)(1). The evidence is viewed in the light most favorable to the nonmoving party. Mancini v. City of Tacoma, 196 Wn.2d 864, 877, 479 P.3d 656 (2021). Judgment as a matter of law is appropriate only when no competent and substantial evidence exists to support a verdict." Paetsch v. Spokane Dermatology Clinic, P.S., 182 Wn.2d 842, 848, 348 P.3d 389 (2015). "A judgment as a matter of law requires the court to conclude, 'as a matter of law, that there is no substantial evidence or reasonable inferences to

---

[9] Moreover, the parties had the opportunity to file motions in limine, and did so relating to both Phase I and Phase II to ensure that certain evidence was excluded from the jury. Neither Progressive nor Rybacki requested that the Phase I evidence categorically be excluded from consideration during Phase II. Indeed, such motions would have been inconsistent with the request for a single jury.

sustain a verdict for the nonmoving party.' " Id. (quoting Indus. Indem. Co. of Nw. v. Kallevig, 114 Wn.2d 907, 915-16, 792 P.2d 520 (1990)). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person that the declared premise is true. Davis v. Microsoft Corp., 149 Wn.2d 521, 531, 70 P.3d 126 (2003). We review judgments as a matter of law de novo, applying the same standard as the trial court. Id. at 530-31.

### A. Claim for Breach of Duty of Good Faith

An insurer has a statutory duty of good faith to its insured. Anderson v. State Farm Mut. Ins. Co., 101 Wn. App. 323, 329, 2 P.3d 1029 (2000); RCW 48.01.030. Breach of this obligation to deal fairly with an insured may result in a tort action for bad faith. Smith v. Safeco Ins. Co., 150 Wn.2d 478, 484, 78 P.3d 1274 (2003). Whether an insurer acted in bad faith is a question of fact. Id. The general tort principles apply, requiring the plaintiff to prove duty, breach of that duty, and damages proximately caused by the breach. Id. at 485.

### 1. Duty

"UIM insurance provides an excess layer of coverage that is designed to provide full compensation for all amounts that a claimant is legally entitled to where the tortfeasor is underinsured." Ellwein v. Hartford Accident & Indem. Co., 142 Wn.2d 766, 779-80, 15 P.3d 640 (2001), overruled on other grounds by Smith v. Safeco Ins. Co., 150 Wn.2d 478, 78 P.3d 1274 (2003). As a UIM insurer, Progressive "stands in the shoes" of the tortfeasor with the same liability to the insured up to the UIM policy limits. Id. at 780. UIM insurers are allowed to assert liability defenses available to the tortfeasor against the insured, resulting in

an adversarial relationship between insurer and its insured. Id. However, "the duty of good faith and fair dealing survives within the UIM relationship," and the insured has a reasonable expectation that they will be dealt with fairly and in good faith by the insurer. Id. Despite the adversarial posture, " 'the insurer must deal in good faith and fairly as to the terms of the policy and not overreach the insured.' " Id. at 781 (quoting Hendren v. Allstate Ins. Co., 100 N.M. 506, 672 P.2d 1137 (Ct. App. 1983)).

Rybacki argues that the insured/insurer relationship establishes Progressive's duty to her as a matter of law. Progressive contends Rybacki "failed to establish that Progressive's duty to issue payment under the Policy arose at any time prior to the Phase I verdict." Progressive's argument artificially narrows its duty to Rybacki to the duty to issue payment. Rybacki's claim was not so limited, either legally or factually.

Whether a duty is owed is a legal question. Junfang He v. Norris, 3 Wn. App. 2d 235, 239, 415 P.3d 1219 (2018). "Under state law insurers have not only a general duty of good faith, RCW 48.01.030, but also a specific duty to act with reasonable promptness in investigation and communication with their insureds following notice of a claim and tender of defense." St. Paul Fire & Marine Ins. Co. v. Onvia, Inc., 165 Wn.2d 122, 132, 196 P.3d 664 (2008); see also Kallevig, 114 Wn.2d at 917.

Rybacki's claim was not limited to Progressive's breach of a duty to issue payment; rather, her complaint framed the duty more broadly: "Defendant Progressive had a duty to act in good faith in the investigation and adjustment of

14

the claims." Moreover, the parties' understanding that Rybacki's claim was not limited to the duty to issue payment is reflected in the neutral statement of the case that they together prepared, and that the court provided to the jury at the beginning of Phase II of the trial:

> Ms. Rybacki requested Progressive to evaluate her damages. Ms. Rybacki claims that Progressive breached the contract, acted unreasonably, and in bad faith *when evaluating her damages*. Ms. Rybacki further claims that Progressive's actions were unfair and that Progressive unreasonably denied Ms. Rybacki payment of her underinsured motorist insurance benefits.

(Emphasis added.) We agree with Rybacki that as a matter of law, Progressive owed Rybacki a duty beyond merely issuing payment to her.

### 2. Breach

The duty to act in good faith is fairly broad, and insurers may breach it by conduct short of intentional bad faith or fraud. Kallevig, 114 Wn.2d at 916-17. Actions by an insurer without reasonable justification constitute bad faith. Id. at 917. "To succeed on a bad faith claim, the policyholder must show the insurer's breach of the insurance contract was unreasonable, frivolous, or unfounded. Smith, 150 Wn.2d at 484. Additionally, WAC 284-30-330 identifies several insurance practices considered unfair or deceptive by the insurance commissioner and that constitute breaches of an insurer's duty of good faith. Tank v. State Farm Fire & Cas. Co., 105 Wn.2d 381, 386, 715 P.2d 1133 (1986).

Rybacki contends Progressive violated WAC 284-30-330(7) and (13). WAC 284-30-330(7) establishes that "[c]ompelling a first party claimant to initiate or submit to litigation, arbitration, or appraisal to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately

15

recovered in such actions or proceedings" is an unfair and deceptive act. And WAC 284-30-330(13) states that "[f]ailing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement" is an unfair or deceptive act.

During Phase II of the trial, Rybacki elicited expert testimony from Dietz that directly addressed the two alleged violations of WAC 284-30-330. Dietz testified that Progressive had assigned Rybacki's claim to a large loss adjuster and set reserves for her claim at $100,000, which contrasted with its maximum settlement offer to her of $20,000. While not conclusive of the value of Rybacki's damages, the jury could consider the discrepancy as evidence of Progressive's bad faith in adjusting the claim. "[R]eserves may be relevant and admissible in a case where the issue is whether the insurance company fulfilled its duty to adjust the insured's claim in good faith." Miller v. Kenny, 180 Wn. App. 772, 812, 325 P.3d 278 (2014). Here, in addition to the $100,000 in reserves, by the time Phase II began, the jury had found in Phase I that Rybacki sustained $1.8 million in damages from the accident. Thus, the evidence established that Progressive offered substantially less than what the claim was worth, requiring Rybacki to sue.

Additionally, Dietz testified that Progressive's evaluation was "frozen," because the offer did not change "despite new information, new evidence, new support." Dietz explained that the corporate representative stated that Progressive did not consider future noneconomic damages or consider injuries

as permanent because of the high cost. After hearing this evidence, a reasonable jury could determine that Progressive's conduct necessitated the litigation for Rybacki to obtain the proper recovery in violation of WAC 284-30-330(7).

Dietz's testimony also supported the claim that Progressive violated WAC 284-30-330(13) by failing to provide reasonable explanations of the insurance policy and reasons for denial. Dietz noted that Progressive provided only numbers without explanation of its financial offers. Progressive failed to include any information as to how it arrived at the various settlement numbers.

Rybacki introduced email messages from a Progressive claim specialist to illustrate the lack of information provided to explain Progressive's assessment of her injuries and the financial offer. An email after the May 2020 assessment merely informed Rybacki, "Based on the information provided to date, we are making a compromise settlement offer of $5,000.00 plus attorney fees and we will forgo our PIP subrogation to resolve your client's UIM bodily injury claim." The testimony and exhibits provided substantial evidence that Progressive failed "to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." See WAC 284-30-330(13). In turn, this evidence of violations of both WAC 284-30-330(7) and (13) provides substantial evidence of the element of breach of duty.

### 3. Proximate Cause

"Insurance bad faith claims require, among other elements, that the insurer have acted in its own interest over the insured's interest and that the

damages be proximately caused by the insurer's bad-faith actions." Beasley v. GEICO General Ins. Co., 23 Wn. App. 2d 641, 667, 517 P.3d 500 (2022). Rybacki testified that after her accident, she became unable to pay her medical bills. She had approximately $19,000 in medical bills in collections and was inundated by calls from collection agencies. She testified that Progressive's timely payment of her UIM coverage would have allowed her to pay the medical bills and seek additional help including chiropractic care and massages. Her noneconomic harm resulting from the stress of unpaid bills would have been alleviated.

Progressive argues that Rybacki's financial problems arose due to her husband's disagreement with his business partner and the impacts of COVID-19 on his business. However, " '[t]here may, of course, be more than one proximate cause of an injury.' " N.L. v. Bethel Sch. Dist., 186 Wn.2d 422, 437, 378 P.3d 162 (2016) (quoting Smith v. Acme Paving Co., 16 Wn. App. 389, 396, 558 P.2d 811 (1976)). Rybacki testified that the financial disruption due to her husband's split with his business partner occurred in late 2018, and soon after, COVID-19 hit. She also testified that her husband "was able to pick everything up within like three months after." Her husband's business involved "getting people together" but he was able to consult online and on the phone.[10] Viewing this evidence in the light most favorable to Rybacki, substantial evidence supports her claim that Progressive's failure to pay under its UIM policy was a proximate cause of her harm.

---

[10] During Phase I of the trial, Rybacki's husband testified that part of his business entails hosting events for entrepreneurs to meet and network.

4. Damages

Because bad faith is a tort, an insured is not limited to economic damages. Anderson v. State Farm Mut. Ins. Co., 101 Wn. App. 323, 333, 2 P.3d 1029 (2000). Damages for bad faith may include "potential effect on the insured's credit rating, damage to reputation . . . loss of interest, attorney fees and costs, financial penalties for delayed payments, and emotional distress, anxiety, and fear." Miller, 180 Wn. App. at 802. Such damages that are personal to the insured are determined by the finder of fact. Id.

Here, Rybacki testified that she had $19,000 in medical bills in collections and her credit rating had declined. She described the emotional toll caused by the inability to pay her medical bills. Based on this testimony, a jury could determine that Progressive's conduct resulted in damages.

Even considering only the evidence from Phase II of the trial, the evidence could persuade a fair-minded, rational person that Rybacki satisfied the elements of duty, breach, causation, and damages necessary to prove Progressive's bad faith in the treatment of her UIM claim. The trial court erred by granting the directed verdict and dismissing Rybacki's bad faith claim.

B. Negligence Claim

In addition to a bad faith claim, Rybacki alleged Progressive was negligent in its handling of her UIM claim. Negligence and bad faith are two separate and distinct causes of action. First State Ins. Co. v. Kemper Nat. Ins. Co., 94 Wn. App. 602, 612, 971 P.2d 953 (1999). "[A] party may fail to use ordinary care yet still not act in bad faith." Id. A negligence claim is based on an insurer's failure to

use ordinary care. Id. at 612-13. In an action for negligence, the plaintiff must demonstrate duty, breach, causation, and damages. Crowe v. Gaston, 134 Wn.2d 509, 514, 951 P.2d 1118 (1998).

Here, Progressive does not dispute that it owed Rybacki a duty to use ordinary care in handling her UIM claim. See First State, 94 Wn. App. at 612-13; Tyler v. Grange Ins. Ass'n, 3 Wn. App. 167, 176, 473 P.2d 193 (1970). As discussed above, the Phase II testimony alone constituted evidence sufficient for a reasonable jury to find the elements of breach of duty, causation, and damages. In addition, Dietz testified that Progressive failed to meet industry custom in several ways: lack of consideration of noneconomic damages, the cutoff period for duration of headaches at twelve months, and the lack of explanation for the settlement offer figures. This expert opinion provides substantial evidence that Progressive failed to act with ordinary care when adjusting Rybacki's claim. Therefore, we conclude that the trial court erred by granting a directed verdict in Progressive's favor and dismissing Rybacki's negligence claim.

### C. CPA Claim

The CPA prohibits unfair methods of competition in the conduct of trade or commerce. RCW 19.86.020. To establish a CPA claim, the plaintiff must demonstrate (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff's business or property; and (5) causation. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 780, 719 P.2d 531 (1986).

"The first two elements of a CPA claim are established where a statute declares that a violation is a per se unfair trade practice." Keodalah v. Allstate Ins. Co., 194 Wn.2d 339, 350, 449 P.3d 1040 (2019). Violations of the insurance code are expressly subject to the CPA. RCW 19.86.170; Kallevig, 114 Wn.2d at 924. A violation of WAC 284-30-330 constitutes a violation of RCW 48.30.010. Kallevig, 114 Wn. 2d at 924.

The third element of a CPA claim may be established per se if the applicable statute contains a specific legislative declaration of public interest impact. Keodalah, 194 Wn.2d at 350. RCW 48.01.030, which imposes a good faith duty on insurance adjusters, establishes a per se public interest. Id. at 351. Thus, a violation of WAC 284-30-330 satisfies the first three elements of the CPA, and "a first party insured may bring an action for violation of the CPA based upon a violation of RCW 48.30.010 resulting from a single violation of WAC 284-30-330." Kallevig, 114 Wn.2d at 924. As discussed above, Rybacki presented evidence from which a jury could determine that Progressive violated WAC 284-30-330(7) and (13), respectively, by its low settlement offers, which required her to initiate litigation to obtain her insurance benefits, and by failing to promptly explain the basis for its settlement offers.

As for the fourth element, injury, the CPA requires an injury to business or property that "excludes personal injury, 'mental distress, embarrassment, and inconvenience.' " Frias v. Asset Foreclosure Servs., Inc., 181 Wn.2d 412, 431, 334 P.3d 529 (2014) (quoting Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 57, 204 P.3d 885 (2009)). However, the focus on "injuries" rather than

21

"damages" means that quantifiable monetary loss is not required, and injury can be both minimal and temporary. Id. For example, "deprivation of contracted-for insurance benefits is an injury to 'business or property.' " Peoples v. United Servs. Auto. Ass'n, 194 Wn.2d 771, 779, 452 P.3d 1218 (2019).

The same testimony discussed above, regarding the elements of causation and damages for the bad faith and negligence claims, establishes substantial evidence that Progressive's conduct caused Rybacki to be deprived of her contracted-for benefits during the long claim evaluation process. Therefore, we conclude that the trial court erred by granting a directed verdict in Progressive's favor and dismissing Rybacki's CPA claim.

### D. IFCA Claim

Under IFCA,

> [a]ny first party claimant to a policy of insurance who is unreasonably denied a claim for coverage or payment of benefits by an insurer may bring an action in the superior court of this state to recover the actual damages sustained, together with the costs of the action, including reasonable attorneys' fees and litigation costs.

RCW 48.30.015(1). IFCA claims require that the insurer's unreasonable act result in the unreasonable denial of the insured's claim, and any damages must be caused by that denial.[11] Beasley, 23 Wn. App. 2d at 667. ICFA damages may include noneconomic damages. Id. at 666.

---

[11] Insurance bad faith and IFCA claims may overlap, but they are not identical. Beasley, 23 Wn. App. 2d at 667. Bad faith claims do not require that the insurer's act results in unreasonable denial of a claim. Id. Additionally, violation of the regulations in WAC 284-30-330 can establish a bad faith claim. Id. at 668. But IFCA does not create an independent cause of action for these regulatory violations. Perez-Crisantos v. State Farm Fire & Cas. Co., 187 Wn.2d 669, 684, 389 P.3d 476 (2017).

Based on Dietz's expert testimony, Rybacki introduced substantial evidence that Progressive's low settlement offers amounted to an unreasonable denial of payment of Rybacki's UIM benefits and that the denial of benefits resulted in her bills going to collections and the associated mental and emotional toll. We conclude the trial court erred by directing the verdict in Progressive's favor regarding Rybacki's IFCA claim.

### E. Breach of Contract

A claim for breach of contract requires a contract that imposes a duty and a breach of that duty that proximately causes damage to the claimant. Nw. Indep. Forest Mfrs. v. Dep't of Lab. & Indus., 78 Wn. App. 707, 712, 899 P.2d 6 (1995). Rybacki and Progressive entered into a contract for UIM insurance. In exchange for Rybacki's payment of her premium, Progressive promised to

> pay for damages that an insured person is legally entitled to recover from the owner or operator of an underinsured motor vehicle because of bodily injury: 1. sustained by an insured person; 2. caused by an accident; and 3. arising out of the ownership, maintenance or use of an underinsured motor vehicle.

Progressive argues that no breach of contract occurred because it paid the $250,000 UIM benefit as soon as it became due, which it claims was when the jury decided its verdict in Phase I. But Progressive's contractual duty did not originate with the jury verdict. RCW 48.01.030 imposes on insurers "a specific duty to act with reasonable promptness in investigation and communication with their insureds following notice of a claim and tender of defense. These are necessarily obligations read into every policy." St. Paul Fire & Marine Ins. Co., 165 Wn.2d at 132.

23

Progressive failed to assess noneconomic damages beyond 12 months and offered to pay less than Rybacki was entitled to during the time the claim was under review and the pendency of the litigation. Dietz testified that Progressive failed to consider and offer benefits to cover Rybacki's noneconomic damages. As a result of Progressive's refusal to pay, Rybacki had $19,000 of medical debt in collections. Because substantial evidence supports Rybacki's claim that Progressive breached its contract by failing to pay her legally entitled damages, we conclude that the trial court erred by granting Progressive's motion to direct the verdict in its favor on Rybacki's breach of contract claim.

II.     Judgment on the Negligence Claim

After Phase I of the trial, the jury returned a general verdict of $1.8 million in noneconomic damages. The parties disputed the form of the judgment, with Rybacki requesting entry of judgment in full against the Estate. The Estate argued that it was not solely responsible for the jury's award, and that as UIM insurer, Progressive shared liability. The trial court agreed with the Estate and entered an order that stated, "Judgment shall be entered in favor of Plaintiff in the amount of $1,800,000 against Defendants Progressive Casualty Insurance and The Estate of Lillian Hiatt." The order specified that Progressive was obligated to pay $250,000 pursuant to the UIM policy and the Estate's obligation was to pay the remaining $1,550,000.

Rybacki argues the trial court should have ordered the Estate to pay the entire amount of the jury's verdict. We agree.

From the time the trial court granted the motion for bifurcation, the format of the trial was clear—Phase I would determine the damages the Estate owed for Hiatt's negligence and Phase II would determine Rybacki's claims against Progressive. Prior to trial, Rybacki moved for partial summary judgment as to the Estate's liability and its asserted affirmative defenses. The trial court granted Rybacki's motion to hold Hiatt's Estate 100 percent liable and dismissed any claims of offset or setoff.

Rybacki did not introduce claims against Progressive during Phase I.[12] Accordingly, the jury instructions in Phase I related only to claims against Hiatt's Estate, not to the claims against Progressive. The jury issued the $1.8 million verdict after Phase I, which pertained only to the determination of damages against the Estate based on Hiatt's negligence. Therefore, the jury did not find any liability or assess any damages against Progressive.

In contrast, Rybacki's complaint differentiates her claims against Progressive from the single claim of negligence against Hiatt that was considered during Phase I. As Rybacki's UIM insurer, Progressive "stands in the shoes" of the tortfeasor, Hiatt, for purposes of defending Hiatt's Estate in the negligence action. But that relationship is based solely on the existence of the UIM contract between Rybacki and Progressive. The $250,000 owed to Rybacki from Progressive arises from that contract, rather than directly from the tort liability the jury found in Phase I.

---

[12] Progressive gave an opening statement and cross-examined witnesses, in keeping with its adversarial relationship with Rybacki as her UIM insurer.

Therefore, judgment should have been entered against the Estate as the sole liable tortfeasor, leaving the impact of Progressive's contractual obligations to Rybacki to be addressed outside this trial proceeding. We vacate and remand the order of judgment so the trial court may properly assess the full amount of the jury's verdict against Hiatt's Estate.

### III.  Attorney Fees

Rybacki requests trial court fees under IFCA and CPA. While acknowledging that she is not yet the prevailing party, Rybacki asserts RAP 18.1(i) allows the appellate court to "direct that the amount of fees and expenses be determined by the trial court after remand." She "requests this Court to direct the amount of her attorney's fees and costs incurred in the portion of her appeal regarding her IFCA and CPA claims be determined by the Trial Court if [she] becomes the 'prevailing party' following the trial of those claims." Both IFCA and CPA provide for attorney fees. RCW 48.30.015(1); RCW 19.86.090. However, at this point, Rybacki's request is premature, as she has not yet prevailed on the merits of her claims against Progressive. Thus, we decline to direct the trial court to enter any fees incurred in this appeal.

### CONCLUSION

We reverse and remand for a new trial on Rybacki's claims against Progressive. We also vacate the order entering judgment on the jury verdict on Rybacki's negligence claim against both Progressive and Hiatt's Estate, and we remand for entry of judgment against Hiatt's Estate as the sole judgment debtor.

_Cheung, J._

WE CONCUR:

_Díaz, J._           _Smith, C.J._